IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

Case No: _____

| | | |
|---|---|---|
| DARYL LEE CLARK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **COMPLAINT** |
| FLOYD COUNTY, GEORGIA; CALEB | ) | |
| H. RATLIFF, as the Administrator of the | ) | **(Jury Trial Demanded)** |
| Estate of Dallas Battle, in his Individual | ) | |
| Capacity; DAVID STEWART, in his | ) | |
| Individual Capacity; MARK WALLACE, | ) | |
| in his Individual Capacity; and CRAIG | ) | |
| BURNES, in his Individual and Official | ) | |
| Capacities, | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiff Daryl Lee Clark (hereafter "Lee" or "Plaintiff"), by and through undersigned counsel, complains of Defendants Floyd County, Georgia; Caleb H. Ratliff, as the Administrator of the Estate of Dallas Battle; David Stewart; Mark Wallace; and Craig Burnes (hereafter "Defendants") as follows:

## <u>INTRODUCTION</u>

1. On December 8, 2022, Lee Clark was exonerated of charges of murder and conspiracy to commit murder. Lee was released from custody on that day, after enduring 25 years in jail and prison as an innocent man.

2.     Lee was just 18 years old when he was wrongfully arrested and convicted. He lost the entirety of his twenties and thirties, languishing in prisons throughout Georgia. Upon his release from custody, at the age of 43, he found a world that had changed in immeasurable ways since his teenage years, the last time he was free. During his past 22 months of freedom, Lee has struggled to pick up the pieces of his life and find his way forward. The scars of a quarter century of incarceration will plague and haunt him for the rest of his life.

3.     For 25 years, Lee Clark was denied his free will and the right to make a life of his own. He was told when to wake up, when to go to bed, when and what to eat, when to shower, and when he could exercise or enjoy fresh air. Loved ones became ill and passed away while Lee was wrongfully incarcerated. He was denied the ability to help or be with them during their times of need. Lee was not allowed to attend their funerals. For 25 years, Lee was subjected to inadequate nutrition and medical care and lived amid the constant threat of prison violence at some of the worst prisons in Georgia. He was stabbed on two separate occasions when other inmates tried to steal his belongings – once during the summer of 2002 at Phillips State Prison and again in 2012 at Macon State Prison. Lee was subject to arbitrary prison discipline and spent significant amounts of time in solitary confinement, including a six-month span in lockdown at Smith State Prison in 2005.

4. This civil rights action is intended to provide Lee Clark some recompense for the immeasurable harms and injuries he suffered during a 25-year wrongful incarceration, as well as the continuing effects arising from that horrific ordeal.

## SUMMARY OF THE CASE

5. Lee Clark's wrongful convictions arose from the tragic accidental shooting death of a 15-year-old boy named Brian Bowling ("Brian"). The shooting occurred in Brian's bedroom, at his family's home situated in a community on the outskirts of Rome, Georgia. The only other person in the room with Brian at the time of the shooting was Brian's best friend, 17-year-old Cain Storey ("Cain"). The gun used was a pistol that Cain had taken from his father's safe. The two boys – Brian and Cain – were playing Russian roulette.

6. Lee Clark had nothing to do with the incident in which Brian was fatally shot. Lee was not in Brian's bedroom. He was not even at the Bowling home that evening. Lee was miles away, at his apartment in Lindale at the time of the shooting.

7. The original investigation by the Floyd County Police Department ("FCPD") correctly determined that the shooting was "accidental" and occurred when Cain and Brian were playing with the gun. Brian had been on the phone with his 15-year-old girlfriend at the time, and his last words to her were, "I'm playing

Russian roulette." Brian's sister Amanda, on the night of the shooting, acknowledged that "Brian shot himself in the head."

8.    Soon thereafter, FCPD investigators charged Cain with involuntary manslaughter. That charge was based upon the conclusion – in all respects, the correct one – that the case involved an "accidental shooting." The investigation should have stopped at that point – an involuntary manslaughter charge against the boy who supplied a gun used in a fatal game of Russian roulette.

9.    How could a case which was deemed an "accidental shooting" and in which the decedent's final words were "I'm playing Russian roulette" result in convictions of two 17-year-old boys on charges of murder and conspiracy to commit murder? The answer lies with Floyd County and its choice to empower three individuals with extraordinary power to wreak havoc on the lives of the County's citizenry.

10.    In this particular case, those three Floyd County officials – FCPD investigators Dallas Battle ("Battle") and David Stewart ("Stewart"), along with Floyd County Coroner Craig Burnes ("Burnes") – were uniquely unfit for their assigned roles. Left unchecked by the County, Battle, Stewart, and Burnes embarked upon a deranged and farcical campaign to transform a tragic accidental shooting into something far more sinister – a supposed premeditated and cold-blooded gang-related revenge killing.

11.    The travesty wreaked on the lives of Lee Clark and Cain Storey by Battle, Stewart, and Burnes could not have unfolded in the absence of those officials' misconduct. Therefore, the depth of the depravity on the part of those individuals must be highlighted in order to understand what their misdeeds wrought in this particular case.

12.    Though other misconduct contributed to the false charges against and wrongful conviction of Lee Clark, these three officials – FCPD investigators Battle and Stewart and Floyd County Coroner Burnes – were the driving force behind the misguided effort that cost Lee Clark 25 years of his life. As summarized below, these County officials were uniquely unqualified to honestly or faithfully fulfill their public duties:

**Craig Burnes:** Floyd County Coroner.

- On August 26, 1999, Burnes pled guilty to more than 30 felony counts of theft and fraud offenses and was sentenced to five years in prison. Charges included making false statements and breach of oath of office, among others.

- FCPD conducted a months-long investigation into Burnes's misconduct. FCPD presented a 32-page summary to the DA's Office which noted offense dates from January 16, 1996, through September 3, 1998. FCPD specifically documented instances in which Burnes threatened to take official action (e.g., identify a cause of death as suicide or suggest foul play) depending upon what personal benefit may inure to Burnes.

- Burnes repeatedly and systematically billed insurance companies and the families of the deceased for services that were not performed or for which no charge was due (e.g., billing for refrigeration services,

body bags, and personal protective equipment). Burnes, as he did with Brian Bowling's family, would submit bills for autopsies where none was performed.

- When a search warrant was presented to Burnes in connection with the FCPD investigation, he cavalierly announced that officers would find nothing because he'd been tipped off by an FCPD officer.

**Dallas Battle:** FCPD Investigator.

- Battle was terminated from the FCPD in May 2007 following an incident in which he was recorded having sex with one of his confidential informants, who was a convicted felon. The woman involved asserted that Battle raped her and that she set up the recorder because of her fear of Battle.

- Battle was arrested on July 20, 2016, for battery and violation of oath of office following an incident in which he repeatedly tased an inmate (Coffman) who was secured to a restraint chair. Another officer at the Polk County Jail reported that Battle told Coffman that "he would be better off dead" and that "if [Battle] could, he would kill Coffman." According to the officer, Battle also threatened to "tase [Coffman's] ass so bad his mother would not recognize him." The Eleventh Circuit characterized Battle's violence as "gratuitous" and "punitive" in holding that, as a matter of law, Battle had violated Coffman's constitutional right to not be subjected to excessive force.[1]

- In an incident two decades earlier, while employed by FCPD, Battle engaged in a similar episode of excessive force against a restrained individual. An Internal Affairs investigation in October 1999 found that Battle and David Stewart went to a site where other officers had a suspect handcuffed and in the back of a patrol car. When Battle and Stewart arrived, Battle purportedly pulled the suspect out of the car, placed his hands around the man's neck and struck him three or four

---

[1]     *Coffman v. Battle,* 786 Fed. Appx. 926, 932 (11th Cir. 2019) (affirming grant of summary judgment where video evidence clearly showed that Battle tased Coffman "who was secured to a restraint chair, only seconds after tightening Coffman's loose left wrist restraint").

times. For this documented incident of unjustified excessive force, Battle was suspended for three days.

- Battle's misrepresentations in a search warrant application were addressed in *Harper v. State,* 657 S.E.2d 213, 216 (Ga. 2008). Battle falsely reported that an anonymous tip that provided the basis for the warrant was made by a "concerned citizen" and otherwise added details to bolster the tip without justification. On appeal, the State conceded that the warrant Battle had orchestrated was invalid and not supported by probable cause.

- In 2016, the Georgia Police Officer Standards and Training Council ("POST"), upon the recommendation of both the Chairman of POST Council and the Probable Cause Committee, revoked Battle's certification as a law enforcement officer, bringing to a close a law enforcement career marked by a profound disregard for the obligations of truthfulness and fidelity to the oaths undertaken by him.

**David Stewart:** FCPD Investigator.

- Upon threat of termination, Stewart resigned from FCPD on January 23, 2007, after it was determined that he had repeatedly taken his official police vehicle out of the county for the purpose of liaisons with his girlfriend. Stewart also allowed said girlfriend to "ride with [Stewart] while [Stewart was] answering calls."

- Stewart was partnered with Battle and together with him went to the site where Battle inflicted unjustified force and berated a handcuffed suspect, as described above (1999 excessive force incident).

- In 2002, Stewart and Battle responded to a call from the Executive Director ("ED") of the Sexual Assault Center of Northwest Georgia. The officers refused her request to transport an individual in need of assistance to an area hospital. A complaint was made that, in refusing to perform his duty, Stewart "pointed his finger in [the ED's] face, and asked her (in a threatening tone) if she wanted to step outside with him" (parenthetical in original). Stewart threatened the ED with arrest. The complaint by the crisis center volunteer reported that

Stewart's behavior "was unprofessional and, frankly, a little scary." She added that Stewart's "intimidation tactics" were "utterly unnecessary."

- Upon information and belief, Stewart was the FCPD officer, described above, who tipped off Burnes regarding the ongoing investigation into Burnes's misconduct in office and the impending search of his computer and premises.

13.     The tragedy that resulted in Lee Clark becoming yet another victim of the misconduct on the part of Battle, Stewart, and Burnes was the accidental shooting death of Brian Bowling.

14.     On the afternoon of October 19, 1996, 15-year-old Brian Bowling ("Brian") died as a result of a gunshot wound to the head. Brian was shot the night before, just after 9:30 pm, while in his bedroom with his best friend, 17-year-old Cain Joshua Storey ("Cain").

15.     Brian and Cain were the only two people in the room at the time the fatal shot was fired. The handgun involved was a .38-caliber Smith & Wesson revolver that Cain had brought to show off to Brian.

16.     Before proceeding to Brian's bedroom, Cain greeted the other people present at the Bowling residence that night: Brian's parents Rocky and Debra Bowling, Brian's sister Amanda and her boyfriend Kenneth Floyd ("Kenneth"), and family friends Wayne and Charlie Childers.

17.     A short while after Cain went to Brian's bedroom, family members heard a loud noise and, at first, thought the boys might have blown a speaker due to the volume of the music that Brian had been playing in his room. Kenneth, as well as Brian's parents and his sister, ran to investigate at the same time Cain opened the bedroom door.

18.     Cain was distraught and exclaimed, "Oh my God! He shot himself in the head!"

19.     Brian was slumped against his bed with a gunshot wound to his right temple. EMS was summoned and Brian was transported to a local hospital by ambulance. He was pronounced dead early in the afternoon on the next day.

20.     Police officers from the FCPD, including investigator Battle, were among the first to arrive at the Bowling residence on the night of the shooting. Their initial conclusion was that Brian had suffered an "accidental shooting."

21.     At the time of the shooting, Brian had been talking on the phone to his girlfriend, 15-year-old Caprice Hiott ("Caprice"). Brian told her that he was "playing with Josh's gun."[2] Caprice would later say, both during a recorded interview and in trial testimony, that Brian's last words to her were, "I'm playing Russian roulette."

---

[2]     Cain's full name is Cain Joshua Storey. Some people knew him as "Cain" and some called him "Josh." Because Plaintiff knew him by the former name, he will be referred to as "Cain" herein.

22.     Cain told the family and FCPD officers the same thing: Brian had been excited to see the gun and asked Cain if he had any bullets. They had placed a single bullet in the revolver and each boy had "dry fired" the gun with the pistol pointed at his own head. They knew that no harm would come because they "cheated" and had seen that the bullet was nowhere near the firing pin. Brian did this twice and Cain once. When the gun was handed back to Brian, according to Cain, he played for real.

23.     Cain urged him not to pull the trigger and told Brian, "I think it's the one," after Brian had spun the chamber and placed the pistol to his head without seeing where the bullet was in relation to the firing pin. According to Cain, Brian replied, "You think so?" and pulled the trigger as Cain looked away.

24.     The limited investigation undertaken that night supported Cain's assertion that the gunshot had been fired by Brian. Investigators wiped Cain's hands to determine if there was any gunshot residue ("GSR") on them. There was not, indicating that Cain had not fired the gun while it had a bullet in the firing chamber.

25.     All relevant facts pertaining to the tragic shooting of Brian Bowling were known in those first few hours: (i) Brian, while on the phone with his girlfriend, told her he was "playing with Josh's gun" and said "I'm playing Russian roulette"; (ii) investigators tested Cain's hands for gunshot residue and confirmed

that the gun had not been in his hand at the time it was fired, meaning the gunshot must have been self-inflicted; (iii) Cain, though remorseful and distraught about bringing the gun to the house, maintained that Brian "shot himself in the head"; and (iv) Brian's sister, in explaining to Brian's girlfriend what had happened, told her that Brian "shot himself in the head."

26.     Some of the misconduct at issue in this case is inexplicable. For instance, investigators never conducted a GSR test on Brian's hands. Other actions were extremely reckless, particularly in light of the gravity of the charges that would soon be contemplated. For example, neither the investigators (Battle and Stewart) nor the coroner (Burnes) ever saw that an autopsy was done or even that a medical examiner was summoned to examine the body and Brian's injuries. Other actions, such as deliberately threatening and pressuring witnesses, were knowingly wrongful and done with malicious intent. Together, through actionable misconduct ranging from recklessness and willful blindness to deliberate fabrication of evidence, Defendants transformed a case involving a tragic self-inflicted gunshot wound into a sinister murder conspiracy plot which would result in a conviction and a sentence of life imprisonment for Lee Clark.

27.     Though Battle neither made nor kept any records and never explained himself, he would later indicate that it was an October 20, 1996, meeting with Floyd County Coroner Craig Burnes at a local funeral home that purportedly caused him

to wonder whether the shooting may not have been self-inflicted. If, in fact, Burnes developed some "findings" that he allegedly shared with Battle, those were never revealed to others nor documented in any manner.

28.     Burnes, however, was not a medical doctor, and was later convicted of multiple crimes involving fraud and dishonesty.[3] At Lee Clark's trial, Burnes testified that he had received a master's degree in forensic pathology, while in actuality he had, at most, attended a simple four-day seminar on "medicolegal death investigations."

29.     At some point in the immediate aftermath of Brian's death, Battle spoke with Brian's aunt, Melody Robinson ("Robinson"). The Bowling family was distraught over their loss and had difficulty accepting the fact that he died as a result of a self-inflicted gunshot wound. Robinson, in particular, pressed Battle to pursue criminal charges related to Brian's death. Upon information and belief, Battle desired to engage in sexual relations with Robinson and this desire apparently animated some of his zeal in the resulting investigation.[4]

---

[3]     In the instant case, Burnes billed the Bowling family more than $7,000 for an autopsy, but there is no documentation that an autopsy was ever conducted. Burnes's subsequent conviction for fraud, breach of oath of public office, and crimes of dishonesty included numerous examples of the same type of misconduct.

[4]     Though it was concealed during the trial, Battle did in fact begin having an affair with Robinson during the pendency of the criminal investigation.

30.     Later in the day of October 20, 1996, and after his meeting with Burnes at the funeral home, Battle and FCPD investigator Mark Wallace ("Wallace") called in Cain for an interview. During this interview, Cain, just as he had on the night of the shooting, expressed remorse for taking the gun to the Bowling home and acknowledged that Brian would still be alive if he had not let Brian handle the gun. Cain repeatedly told investigators that the fatal shot occurred when Brian had the gun in his hand and played Russian roulette without "cheating."

31.     Investigators refused to accept Cain's account and repeatedly pressed Cain to admit that he accidentally shot Brian. Battle and Wallace persuaded Cain that if he confessed to an accidental shooting, then they "[could] all go," with the implication that he would be charged with murder if he did *not* admit to accidentally shooting Brian. Under duress, Cain eventually succumbed to the pressure campaign exerted by the investigators and told them what they had been demanding to hear: "I accidently [sic] shot him."

32.     Cain was immediately arrested and charged with involuntary manslaughter. Battle noted in the Incident Report that the shooting was "unintentional."

33.     Despite investigators' repeated representations that they knew Brian's shooting was accidental and that they had no intent of charging Cain with murder, they immediately set about on a scheme to do just that. Their primary target,

however, was not Cain, but was instead a 17-year-old friend of Cain's named Lee Clark.

34.    The precise reason that investigators, and Defendant Battle in particular, began to focus on Lee is not yet known. It is clear, however, that Battle carried a very personal and longstanding animus toward Lee. Additionally, Lee, at some point in the past, had words with Brian's mother and chastised her for not providing a better home for Brian.

35.    Regardless of the reason, Defendants proceeded to spin a tale of a violent, drug-crazed gang which was headed by Lee. Defendants' story was complete fiction.

36.    Though no evidence suggested any involvement by Lee in Brian's death, and in fact Lee was miles away from the Bowling residence at the time of the shooting, Battle and the other Defendants conspired to implicate Lee in the death.

37.    To this end, they hit upon a way to ensnare Lee in a bizarre murder conspiracy that, according to Defendants, involved a murderous gang of teenagers bent on vengeance, an "execution style" gang revenge killing, and the complicity of Brian's 15-year-old girlfriend, Caprice, who was not yet old enough to drive.

38.    In one version of this invented conspiracy, Lee, Cain, and Caprice diabolically planned and brought about an elaborate murder plot in which Lee, after being summoned by Caprice with the use of a pager, was alleged to have

snuck surreptitiously to Brian's window and fired the fatal shot from outside the house.

39.     Defendants' story had no basis in reality. And because it was concocted out of whole cloth, Defendants needed to fabricate evidence to support it. Over the next seven months, Defendants did just that.

40.     First, Defendants instigated and spread rumors of the existence of a nefarious "gang" operating in rural Floyd County, Georgia, and helped to convince the Bowling family that Brian's death may have been the result of some sinister gang-related plot. Battle and FCPD investigators provided demonstrably false information related to the investigation to local newspapers on multiple occasions.

41.     Next, Defendants sought out vulnerable individuals who could be enticed or coerced into parroting the fictional narrative created by FCPD investigators. They focused on those who had had run-ins with the law and teenagers who they believed could be easily pressured and manipulated.

42.     To this end, Defendants found a useful rube in the form of a single mother, Angela Bruce ("Angela"), who, as the subject of a county family-services inquiry, proved susceptible to threats of having her children taken from her.

43.     In May 1997, investigators coerced Angela into saying falsely that both Cain and Lee had attended a party at her home three months earlier and had boasted about being in a gang and having killed Brian "execution style."

44.     In fact, Lee never attended a party at Angela's residence. He had never once seen Angela before she took the witness stand at his criminal trial.

45.     No other witness supported Angela's story, which had been fed to her by FCPD investigators – and Defendants unlawfully concealed evidence that would have exposed the falsehoods in the story that Angela told at their behest.

46.     With Angela's statement in hand, Defendants successfully procured what they wanted – supposed evidence of a gang killing of Brian, that was either committed or orchestrated by Lee. Seven months after Brian's death Defendants charged Lee with murder and conspiracy to commit murder. They upgraded the charges against Cain to include those same counts in addition to the original charge of involuntary manslaughter. No probable cause supported the arrest warrant that Defendants issued against Lee on May 23, 1997, nor his subsequent seizure.

47.     Defendants thereafter continued with efforts to entice, pressure, and coerce witnesses to make incriminating statements about Lee and Cain. One such witness was Charlie Childers ("Charlie"), a hearing-impaired individual with extreme communication difficulties who was in the living room of the Bowling home on the night of October 18, 1996, when the shooting occurred. Defendants fabricated a statement and an eyewitness identification that they would attribute to Charlie to bolster the case against Lee.

48.    In January 1998, Lee and Cain were tried together. No actual evidence (nor probable cause) supported the murder conspiracy charges against them. Defendants caused fabricated evidence to be used against Lee and Cain at trial, just as that same manufactured evidence was employed to procure arrest warrants and indictments against them. Defendants also wrongfully concealed exculpatory evidence that they were duty-bound to disclose to the prosecutor pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963). Due to Defendants' misconduct, false and fabricated evidence was presented to the jury while exculpatory evidence remained concealed.

49.    On January 19, 1998, Lee was wrongfully convicted of both murder and conspiracy to commit murder. He was sentenced to life imprisonment. Despite his continued pleas of innocence, Lee's appeal and all post-conviction efforts were rejected.

50.    In late 2021, two podcasters began a re-investigation of the circumstances of Brian Bowling's death. Their efforts led to the discovery of long-concealed misconduct on the part of law enforcement officers and the false testimony of key witnesses against Lee.

51.    In time, the Georgia Innocence Project ("GIP") took on Lee's case and, on September 16, 2022, GIP filed an Extraordinary Motion for New Trial ("EMNT"), and a companion state-court Application for Writ of Habeas Corpus, on his behalf.

The EMNT was granted by Order issued on December 8, 2022, and Lee's convictions were vacated.

52.     Lee Clark was released from custody on December 8, 2022. He had spent more than 25 years in jail and prison for crimes of which he was completely innocent. This action seeks to compensate Lee for the quarter century he spent incarcerated as an innocent man and for the continuing effects of his wrongful incarceration.

## JURISDICTION AND VENUE

53.     Plaintiff brings this action under 42 U.S.C. § 1983 for acts committed by Defendants under color of state law which deprived him of liberty without due process of law, in violation of his rights under the United States Constitution.

54.     This action arises under the Constitution and laws of the United States. This Court has original jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3).

55.     This Court has pendent jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367(a) because they are part of the same case and controversy described by Plaintiff's federal claims.

56.     Pursuant to 28 U.S.C. § 1391(b), venue is proper in the United States District Court for the Northern District of Georgia as a substantial part of the

events or omissions giving rise to the claims at issue in this matter occurred in this District.

57.    On December 8, 2022, Plaintiff's convictions were invalidated by Judge John E. Niedrach of the Floyd County Superior Court in an Order Granting Defendants' Extraordinary Motions for New Trial.

58.    Plaintiff's civil rights claims, as alleged herein, accrued on December 8, 2022, and are thus timely filed. *See McDonough v. Smith*, 508 U.S. 109 (2019); *Heck v. Humphrey*, 512 U.S. 477 (1994).

## PARTIES

59.    Lee Clark is a citizen and resident of the State of Georgia. He resides in Silver Creek, Georgia, which is situated within the Northern District of Georgia.

60.    Defendant Floyd County is a municipal corporation organized under the laws of the State of Georgia. The Floyd County Police Department ("FCPD") is, and was at all times pertinent to this action, a department of Defendant Floyd County. Upon information and belief, Floyd County has purchased and maintained applicable policies of liability insurance and has thereby waived governmental immunity that might otherwise be available to Floyd County and its personnel and officials, including but not limited to those employed with the FCPD.

61.     Upon information and belief, Dallas H. Battle ("Battle") died on March 5, 2021, and no estate was opened on his behalf. Plaintiff, through counsel, has petitioned the Probate Court of Floyd County, in accordance with Georgia law, to open an estate for Battle and has requested that the County Administrator, attorney Caleb H. Ratliff, be appointed as administrator of the Estate of Dallas H. Battle.[5] Plaintiff anticipates that the County Administrator will, in accordance with O.C.G.A. § 53-6-40, be appointed to accept service on behalf of the Battle estate. At all relevant times, Battle was employed as a police officer and investigator with the FCPD and was acting under color of law and within the scope of his employment with Floyd County and the FCPD.

62.     David Stewart ("Stewart") is, upon information and belief, a citizen and resident of Georgia. At all times relevant to the Complaint, Stewart was employed as a police officer and investigator with the FCPD and was acting under color of state law and within the scope of his employment with Floyd County and the FCPD. Stewart is sued in his individual capacity.

---

[5]     Undersigned counsel previously sent the County Administrator a courtesy copy of the Complaint with the request that he make same available to: (1) the County Attorney for Floyd County; (2) the County Manager for Floyd County; (3) the Floyd County Probate Court; and (4) the heirs of Battle. Plaintiff has no preference as to whether the Battle estate is administered by the County Administrator or some other person, and simply wishes that the estate be opened, pursuant to prevailing Georgia law, for purposes of this lawsuit, and that timely notice be made to Floyd County and any insurers, attorneys, or other persons vested with an interest in the proper administration of this action.

63.     Mark Wallace ("Wallace") is, upon information and belief, a citizen and resident of Georgia. At all times relevant to the Complaint, Wallace was employed as a police officer and investigator with the FCPD and was acting under color of state law and within the scope of his employment with Floyd County and the FCPD. Wallace is sued in his individual capacity.

64.     Craig Burnes ("Burnes") is, upon information and belief, a citizen and resident of Georgia. At all times relevant to the Complaint, Burnes was the duly elected Coroner for Floyd County, served as an official and employee of Floyd County, and acted within the scope of his employment and office as Coroner of Floyd County. Burnes is sued in both his individual and official capacities.

65.     At all relevant times relevant, in committing the acts and omissions herein alleged, each of the Defendants was acting within the scope of his employment and under color of state law.

## FACTS

## I.    LEE CLARK IS UNLAWFULLY ARRESTED AND WRONGFULLY PROSECUTED FOR MURDER AND CONSPIRACY TO COMMIT MURDER.

### Brian Bowling – Rambunctious 15-Year-Old

66.     In October 1996, Brian Bowling ("Brian") was 15 years old and lived with his parents Rocky and Debra Bowling, along with his sister Amanda. They lived in a mobile home at 271 Craton Road in Silver Spring, Georgia, a small, rural

community some ten miles away from Rome, Georgia, the county seat of Floyd County.

67.     The Bowling family home was situated near the Pleasant Hope Church, which fronted Rockmart Highway, the two-lane highway that leads to Rome. A vast cemetery occupies the sloping hillside behind the church. Brian's best friend, Cain Storey ("Cain"), lived on the other side of the cemetery. Other extended members of Brian's family had homes nearby in the same community of Silver Creek.

68.     Brian was a good kid, but he had a rambunctious, mischievous side to him. He was known for impulsive, sometimes reckless, actions. For instance, there were occasions on which he would lie down in the middle of Rockmart Highway near his home as a type of dare while friends would scream for him to get up and out of the roadway before being struck by a passing vehicle. He would dodge trains and play "chicken" on motorbikes.

69.     In the fall of 1996, Brian attended Coosa High School, an "alternative school" to which he had been transferred from Pepperrell High School due to behavioral issues. At that time, he was also on house arrest following an incident in which he had stolen a gun.

70.     While attending Coosa High School, Brian met and became boyfriend-girlfriend with 15-year-old Caprice Hiott ("Caprice"). Since Brian was

bussed to school and Caprice lived on the other side of Floyd County, the two rarely saw each other outside of school. They had never been to one another's house and had seen each other outside of school only a time or two. Brian and Caprice, however, talked frequently by phone.

71.     Brian and some of his teenage friends would occasionally engage in petty mischief and recreational marijuana use. On one occasion, Brian and Cain took and ran off with leftover medications that Brian's father had been prescribed following surgery to address an aneurysm.

72.     The boys often listened to loud music, and Brian, Cain, and other friends sometimes talked of starting a band. Their favorite musical group was Bone Thugs-n-Harmony and the group's song "The Crossroads" was something of an anthem for the boys. They were also fans of Lynyrd Skynyrd and that group's song "Free Bird."

73.     Cain was often at the Bowling home and even stayed overnight there on occasion. He spent several nights at the Bowling home in early October 1996, after he had been kicked out of his own house for taking part in a theft of his father's safe on October 3, 1996.

## The Accidental Shooting of Brian Bowling

74.     On the afternoon of October 18, 1996, Brian worked with Wayne and Charlie Childers, two brothers who were longtime family friends with the Bowling

family. Along with the Childers brothers, Brian had cut grass and performed lawn maintenance tasks at the cemetery near his home and Pleasant Hope Church.

75.     While Brian was out working, Caprice called several times to talk to him, as was their usual practice. During at least a couple of occasions on which Caprice called, Amanda's boyfriend Kenneth Floyd teased her and told her that Brian was out with another girl. Brian did not return home from working with the Childers brothers until approximately 9:00 pm on the evening of October 18, 1996.

76.     Wayne and Charlie Childers went to Brian's house with him and joined the others there – parents Rocky and Debra Bowling and sister Amanda with boyfriend Kenneth – all of whom were watching television in the living room. Brian spoke with his mother about dinner and heard that his girlfriend Caprice had called. Brian took the cordless telephone to his room to return her call.

77.     While Brian's family and their friends watched television in the living room, they heard the familiar thumping of loud music emanating from Brian's bedroom. Soon thereafter, Cain stopped by the Bowling house. He spoke with those in the living room and asked if Brian was home. When told that Brian was in his room, Cain walked there, knocked on Brian's door, and then entered the bedroom. Unbeknownst to those in the living room, Cain had brought with him a handgun that belonged to Cain's father.

78.     Brian was still on the phone with Caprice when Cain entered Brian's bedroom. In short order, Cain showed off the gun, a .38-caliber Smith & Wesson revolver, to Brian, who asked if Cain had any bullets with him.

79.     The two talked briefly about taking the gun outside to do target practicing. Brian then asked for a bullet and to hold the gun and Cain gave him both the pistol and one of the two bullets that he had with him. Caprice asked Brian what was going on and he said, "I'm playing with Josh's gun." Brian loaded a bullet in the chamber and then placed the gun to his right temple, as if to play Russian roulette.

80.     Brian pulled the trigger, and the chamber simply rotated. He had "dry fired" the gun. There was no live round in the firing chamber and Brian knew this. He was, in essence, playing Russian roulette, but he was "cheating." He knew where the bullet was in relation to the firing pin and that there was no risk in the bullet being fired from the gun. Brian did this again, and Cain urged Brian to stop and to hand the gun back to Cain.

81.     Brian then handed the gun back to Cain, who proceeded to do the same thing that Brian had just done. Cain placed the gun to his own head and pulled the trigger, albeit with knowledge that the single bullet in the chamber was nowhere near the firing pin and that the gun would not discharge. Cain handed the gun back to Brian.

82.     Caprice asked Brian what he was doing, and he told her, "I'm playing Russian roulette." Those would be the last words that Brian spoke to her.

83.     After placing the cordless phone in his lap, Brian spun the chamber as if to play Russian roulette for real. He placed the gun to his right temple without checking to see where the bullet was in relation to the firing pin.[6] Cain urged Brian to stop and to not pull the trigger, telling him, "Don't do it, man. I think it's the one," or words to those effect. Brian asked, "You think so?"

84.     Cain turned his head away from Brian. From experience, he knew that his young friend sometimes did reckless things when he had an audience or to get attention. Cain hoped that by looking away, Brian would lose interest with the gunplay and set the gun down or return it to Cain.[7] The next thing Cain heard was the sound of the gun firing. He turned to see the horrific sight of his best friend in the immediate aftermath of suffering a gunshot wound to his temple.

---

[6]     There were two distinct features with this pistol. First, the chamber rotated counterclockwise, whereas many pistols have a chamber that turns in a clockwise manner. Second, the chamber of this gun could hold five bullets, while many pistols have a six-round chamber.

[7]     This recitation of facts related to events which occurred in Brian's bedroom in the moments before the fatal shot was fired is based upon the available objective evidence and the most consistent and most plausible statements of witnesses who could shed light on precisely what transpired. The most salient fact for Plaintiff, of course, is that he cannot personally attest to what happened because he was nowhere near the Bowling home at the time. The next most critical fact that can no longer be seriously disputed is that the shooting was an accidental one. Whether the gun was in Brian's hand or whether perhaps Cain was trying to take the gun from Brian when it discharged is a detail of which Plaintiff could have no direct personal knowledge.

85.     As Cain rushed to get help, Brian's family ran to his room to see what had happened. They found Brian slumped against his bed, bleeding profusely from the right side of his head. The scene was frenzied and chaotic: music was still blaring; Rocky tried to disconnect the call with Caprice so 911 could be called; Brian was placed on the floor with a pillow under his head; Debra, a nurse, rushed into the bedroom to administer CPR.

86.     There was a palpable degree of shock as Cain wrestled to comprehend what had just transpired in front of him and the reality that what occurred involved the handgun and a bullet that he had foolishly taken to the Bowling home and shown to his young, impulsive friend. Brian's family tried to make sense of the situation, while summoning EMS and trying to render first aid.

87.     In those first seconds, it was not even clear that a gun had been discharged. Debra Bowling's initial thought was that the boys were playing the music so loudly that they blew a speaker. Caprice never heard a gunshot, only the frantic screams that rocked the house in the gruesome aftermath.

88.     When he first saw Brian's family at the doorway to the bedroom, Cain exclaimed, "My God, he shot himself in the head." He was scared and dismayed, horrified by what had happened. Cain told someone at the house, "He just took the gun, put it to his head and shot hisself [sic]." Others at the house would later recall hearing something different in those first harried moments. They heard, or

thought they heard, Cain say, "I didn't mean to kill him" and/or "I can't believe he shot hisself" [sic] and/or "I didn't mean for him to die."

## A Botched Investigation into the Circumstances of the Shooting

89.    An EMS crew from the Rome Fire Department responded promptly to the Bowling home. The call was listed as a "possible suicide." One of the first responders, Captain Kelly Nelson, saw Cain and would later characterize him as "nervous and upset." Nelson was the first person to take custody of the gun used in the shooting, placing it in a paper sack.

90.    Officer Mark Corbin ("Corbin") of the FCPD was the first law enforcement officer to arrive on scene, having been dispatched at 9:37 pm and arriving a few minutes thereafter. Corbin spoke with Cain and others at the scene but prepared no reports, witness summaries, or transcripts of those conversations.

91.    Corbin would later characterize Cain as "nervous" and would attribute to Cain the following statements: "I didn't mean to kill him" and "I didn't mean for him to die." Corbin asked Cain how it happened, and Cain said, "Well, he -- he shot hisself [sic]." There are no notes, recordings, or FCPD reports related to these statements by Cain on the night of the shooting.

92.    Carl Lively ("Lively") was the next FCPD officer on scene, arriving at the residence within ten minutes after the dispatch call went out. Lively sat in a bedroom with Corbin and Cain, waiting for the scene to be cleared by EMTs.

According to Lively, Cain said, "I didn't mean to kill him" and "further elaborated that he felt responsible because he brought the pistol to the residence." (Trial Tran., p. 112.)[8] Lively would later claim that he made contemporaneous notes of his conversations with Cain on "a piece of paper" that he gave to FCPD investigator Battle, but no such notes have ever been produced.

93.     Battle arrived at the Bowling residence just as the ambulance was pulling away. Battle took custody of the revolver, which had been given to Corbin by Captain Nelson, and secured the weapon in his vehicle. Battle joined officers Corbin and Lively in the bedroom with Cain and asked him what happened. Cain told Battle that "Brian had shot hisself [sic]."

94.     Battle, who served as lead investigator in the matter, called Captain Tommy Shiflett ("Shiflett") for assistance and kept Brian's bedroom secure while waiting for Shiflett and a photographer from Clyde Collier Photography to arrive.[9]

---

[8]     For his part, Cain has consistently maintained that the gun was in Brian's hand when it discharged and that the shooting occurred when Brian played a single round of Russian roulette without "cheating." He recalls saying, in addition to, "He shot hisself [sic]" that "I didn't mean for this to happen."

[9]     Floyd County and the FCPD engaged a private photographer, Clyde Collier Photography, to attend crime scenes and accident locations and to take photographs. By agreement, the photographs taken by this private citizen photographer would be made available free of charge to the FCPD but others, including defense lawyers, had to purchase photographs. FCPD officers would also, on occasion, take photographs. The system employed by Floyd County and FCPD led to confusion as to the origin of photos and also resulted in defense lawyers not always receiving evidence to which they were entitled. This happened in the instant case, with Lee's attorney mysteriously receiving

At the scene, Battle took custody of only two items of evidence: (i) the pistol used in the shooting; and (ii) the spent casing in the chamber of that handgun. He also received a bullet from Kenneth Floyd. Cain had given the bullet to Kenneth Floyd earlier, when emergency personnel were trying to determine the caliber of the bullet involved.

95.     Only the handgun itself would actually be logged and placed into the evidence locker at FCPD. Between his trip from the Bowling residence to the hospital where Brian was admitted and then back to FCPD, Battle purportedly lost both the spent casing and the live bullet. Those items were never found. The bullet that undoubtedly exited Brian's skull was never located by Battle or any other FCPD investigator.

96.     Incredibly, investigators did not conduct interviews with or obtain any recorded statements from *any* of the six adults in the Bowling home on the night of the shooting. The police would later have conversations with three of them – Debra Bowling and Wayne and Charlie Childers – but not until seven months after the shooting and under suspicious circumstances. The first accounts of Amanda Bowling and Kenneth Floyd would be offered for the first time at trial, some fourteen months after Brian's death.

---

crime scene photos on the eve of trial and which differed in material ways from photos that had been earlier produced.

97.     While Battle may have spoken briefly with Debra Bowling at the hospital on the night of the incident, but he created no report of that conversation and never made any notes or record of what was said.

98.     Cain was taken to the FCPD on the night of October 18, 1996. There, Cain was interviewed by investigators, including Battle. The interrogation was not recorded, and no notes, reports, or records were created regarding what Cain was asked or how he responded. Battle did swab Cain's hands for purposes of a gunshot residue ("GSR") kit with the apparent intent of determining whether the gun was in Cain's hand at the time it was fired (it was not, as reflected by the result of the GSR test).

99.     Battle took no steps to administer or have administered a GSR test on Brian Bowling's hands. He did not swab Brian's hands or ask that anyone else do so. Battle never asked hospital staff to swab Brian's hands or to place a protective covering on them so that a GSR test could be administered at a later time.

100.    There is no reasonable explanation for the failure of Battle, as lead investigator, to see that a GSR test was performed on Brian's hands. Such a test would have conclusively established the veracity of what Cain reported in the immediate aftermath of the tragic shooting: that "[Brian] shot himself in the head."

101.    Battle's initial incident report accurately described the circumstances surrounding the tragic events of October 18, 1996: "Shooting – Accidental." Battle's Narrative read as follows:

> Reporting officer received a call to above location to a shooting. Upon arrival officers found above victim laying in the bedroom floor with a gunshot wound to the head. A .38 S&W revolver was laying in the floor. Officer Mark Corbin recovered the weapon and turned it over to Sgt. Battle. Cain Storey was in the room with the victim when the victim was [sic] put the gun to his head and pulled the trigger. The victim did this three times before the gun discharged. The victim was talking with his girlfriend on the phone at the time of the shooting. He told her that he was playing Russian roulette. Victim was transported to Redmond Park Hospital and admitted to I.C.U. Victim was listed in critical condition at time of report. Deputy coroner Craig Burnes called Sgt. Mark Wallace on 10-19-96 and stated that the victim died Saturday morning, 10-19-96 at Redmond Park Hospital.

102.    Battle and FCPD investigators failed to ensure that the scene of the shooting was properly documented, either with photographs or otherwise. Some photographs were taken at the residence by one or more FCPD officers, though no contemporaneous records of this investigative task were kept. At a different point on the night of the shooting, Dan Scott of Clyde Collier Photography took other photographs at the residence. Again, there were no contemporaneous records made and there are discrepancies in how Brian's room is pictured in the various photos taken that night.

103.    Battle's and FCPD investigators' failure to conduct and record proper interviews, and their concomitant failure to photograph and document the scene of the shooting during the evening of October 18, 1996, allowed for and precipitated significant discrepancies in various witnesses' recollections as to what was said, particularly by Cain, and the condition of Brian's room.

104.    For example, questions arose as to whether a bloody pillow had been "hidden" in a hole in the wall or was in plain sight, and whether the room's one window was open, or whether it was covered by a makeshift barrier consisting of plywood and a sheet or blanket.[10]

105.    In addition to failing to have Brian's hands tested for the presence of gunshot residue, Battle and FCPD investigators did not see that an autopsy was done on Brian's body or even viewed by a medical examiner. Simple and routine investigatory steps were readily available that would have conclusively confirmed investigators' initial impression – that the shooting was "accidental" and "self-inflicted."

---

[10]    The record suggests that FCPD investigators intended to conceal certain crime-scene photographs and the true state of Brian's bedroom on the night of the shooting. Defendants sought and procured witness statements that incorporated some of these inaccurate facts. For instance, some witnesses, after meeting with FCPD investigators, would assert they heard the "hidden" pillow had been used to silence the gunshot and/or to hide the gun from Brian. The discrepancy as to whether the bedroom window was covered by a piece of plywood allowed investigators to elicit statements suggesting that Lee fired the fatal shot either from outside or while leaning into the window.

## <u>Cain's Account of a Self-Inflicted Gunshot Wound While Playing<br>Russian Roulette is Confirmed</u>

106.    Nothing belied Cain's account that Brian's shooting death was accidental. No evidence suggested that the gun was in Cain's hand, as opposed to Brian's, when it discharged. However, after the fact, and following conversations with FCPD investigators such as Defendant Battle, Brian's family asserted they thought Cain acted "off" or "nervous" on the night of the shooting.

107.    Cain was unquestionably distraught after the shooting. His best friend shot himself in the head in his immediate presence with a handgun that Cain took to the Bowling home. Cain understood that if he had never brought the gun over to show it off, his friend would not be clinging to life at a hospital. FCPD officers noted that Cain expressed remorse for his part in taking the gun to the house but maintained that "Brian shot himself in the head."

108.    Sometime around 10:00 pm on the evening of October 18, 1996, Brian's 15-year-old girlfriend Caprice called back to the Bowling home to find out what had happened. She spoke with Brian's sister, Amanda Bowling, who told her: "Brian shot himself in the head."

109.    A newspaper article regarding the shooting death appeared in the October 20, 1996, edition of the *Rome News-Tribune* titled "Russian roulette proves fatal for Pepperell student." The article quoted FCPD Captain Tommy Shiflett as

describing Brian's actions and his playing Russian roulette. Shiflett stated: "The first two times he hit empty chambers, and the third time he hit the bullet."

110.    On Sunday, October 20, 1996, Caprice was interviewed by Battle and Sergeant Mark Wallace ("Wallace") of the FCPD. During an extended, recorded conversation in which Caprice was weeping and distraught, Caprice repeated what she had told FCPD investigators on the night of the shooting and corroborated Cain's account of the events in Brian's bedroom that night.

111.    Caprice told Battle and Wallace on October 20, 1996, "I asked what he was doing and he said he was playing Russian roulette and that's the last words he ever said to me." Caprice also relayed the content of her conversation with Amanda Bowling at approximately 10:00 pm on the evening of the shooting, in which Caprice called the Bowling residence to ascertain what was going on and was told, "Brian shot himself in the head."

112.    In the immediate aftermath of the shooting of Brian on the evening of October 18, 1996, nothing indicated that the incident was anything beyond what it was – a tragic accident that occurred because two boys, one 15 years old and the other 17 years old, foolishly chose to play with a loaded gun.

113.    As difficult as it was to face, Brian's own family acknowledged at the time that the gunshot wound was self-inflicted. That conclusion was consistent with the other evidence collected (e.g., Brian's contemporaneous statement to

Caprice that he was "playing Russian roulette" and Cain's statement to family members and FCPD officers that Brian impulsively played the game without cheating and with dire consequences on the third time he pulled the trigger).

114.   The case should have been closed with the same conclusion FCPD investigators arrived at on the evening of October 18, 1996 – "accidental shooting." At some point soon thereafter, however, FCPD investigator Battle decided that a criminal case was warranted.

115.   Precisely what prompted Battle to embark on institution of criminal charges – first for involuntary manslaughter based upon an "unintentional" shooting by Cain, and later for murder and conspiracy to commit murder by Lee Clark – was never set down in writing by Battle.[11] Battle neither made nor kept any notes or reports regarding the genesis of his invented tale of a sinister murder plot. The evidence suggests that one possible motive was an attempt to curry favor with Brian's aunt, Melody Robinson, who didn't want to believe that Brian had killed himself, and with whom Battle successfully sought a sexual relationship.

---

[11]    Battle had a proclivity for using his role as a law enforcement officer to further his extracurricular romantic and sexual interests. He and Robinson began having an affair during the investigation that Battle "promised" her would be undertaken. Additionally, it was well-known that Battle had repeated run-ins with area teenagers, that he viewed Lee with disdain, and had vowed "to get" him one day.

116.   In any event, it appears that Battle's plan to launch a murder investigation coincided with an October 20, 1996, phone call and subsequent meeting between Battle and Floyd County Coroner Craig Burnes. There are no records or notes relating to the telephone conversation between Burnes and Battle that led to their meeting at the funeral home where Brian's body was sent from the hospital.

### Craig Burnes Recklessly Bungles the Handling of Brian's Body

117.   Under Georgia law, a coroner ultimately bears the responsibility of deciding whether an autopsy is to be done. In practice, a coroner would typically make this decision in consultation with law enforcement investigators and a medical examiner.

118.   Burnes, in his role as Floyd County Coroner, had the authority and responsibility to order that an autopsy be performed in the case of Brian Bowling's death, but he did not order an autopsy, nor did he contact or consult with a medical examiner.

119.   Burnes viewed Brian's body at a funeral home after the body had been taken there from the hospital. Though Burnes told the Bowling family that Brian's body was sent to the Georgia Bureau of Investigation Crime Lab for an autopsy, this was not true.

120.    Upon information and belief, no autopsy was ever performed on Brian's body. Burnes, however, billed the family for an autopsy and collected approximately $7,000 for the never-performed procedure.

121.    In addition to billing families for autopsies that did not occur, as he did with the Bowling family, Burnes also regularly engaged in another form of fraud related to autopsies: billing families and loved ones for autopsies that were actually performed by others but for which no charge was owed, and for which no sums could lawfully be collected.

122.    Burnes was later charged and convicted in connection with multiple state and federal felony theft and fraud criminal violations related to activities of this type.[12]

123.    At the funeral home, in a macabre and horrific pseudo-scientific experiment, Burnes jammed rods in both the entrance and exit wounds in Brian's skull pursuant to some crude effort, purportedly, to discern the bullet's trajectory. However, Burnes possessed no training or expertise which would allow him to attain any meaningful information from his purported "examination" of Brian's

---

[12]    Burnes routinely engaged in both types of frauds with respect to autopsy charges – billing some families where an autopsy was never done and billing families for autopsies for which no charge was due. In both types of incidents, Burnes would keep for himself the funds he collected from grieving families.

body and the placement of the rods in Brian's skull. He was not a medical doctor nor a trained forensic pathologist.

124.    Upon information and belief, Burnes told FCPD investigators that the gunshot which killed Brian was fired at "some distance" and was not a "contact wound."[13] The investigators appear to have latched onto and later exploited Burnes's uninformed, unscientific opinions that the gunshot that killed Brian was not a self-inflicted wound.

125.    There were means readily available to establish, in the hours after the shooting, that the gun was in Brian's hand when it discharged. A GSR test of Brian's hands would have revealed the existence of gunshot residue, establishing that Brian fired the shot. Additionally, an autopsy would have shown stippling on Brian's skin and scalp, a finding which would have established that, as Cain reported, Brian held the gun close to his right temple at the time he fired the gun.

---

[13]    It is not clear what Burnes's actual opinion was, nor what he told investigators. While he testified at trial that the gun was at least "12 to 18 inches" from Brian at the time it discharged, Wallace apparently had different information. During the interrogation of Cain, (*see* paragraph 140, supra), Wallace interrupted Cain's response about his distance from Brian and said, "the wound was closer." Unclear is whether Wallace also met with Burnes and Battle at the funeral home or whether he obtained information related to Burnes's purported observations at a later time from Battle or from Burnes himself.

It appears that Burnes's "opinion" may well have changed contemporaneously with Defendants Battle and Stewart concocting the murder conspiracy story which would eventually entail Battle soliciting jailhouse informants to say that Lee possibly fired the gun while standing outside of Brian's window.

126.    During his examination of the body, Burnes took photos with the metal rods protruding from Brian's skull. The photographs are grainy and of poor quality, but they appear to plainly show dark powder burns around the entrance wound – a telltale sign of a close contact wound, which would have provided powerful corroboration of Cain's account of a self-inflicted gunshot.

127.    Burnes would explain away the apparent powder burns by claiming that what was depicted in the photographs was some unspecified "packing material." Because Burnes did not see that an autopsy was performed or that a medical examiner was summoned, Burnes's story about a "distance shot" was allowed to take root. Upon information and belief, Burnes shaped his supposed findings and, later, his trial testimony, to fit the story that FCPD investigators Battle and Stewart wanted to hear.

128.    No records or notes were made pertaining to the Sunday, October 20, 1996, meeting at Henderson Funeral Home involving Burnes and Battle, and possibly Wallace. It is clear, however, that the men viewed Brian's body, and that Burnes had inserted the aforementioned metal rods into the entry and exit wounds in Brian's head.

129.    Battle would later claim that he learned "something" during the meeting with Burnes and/or the viewing of Brian's body that caused him to question whether the injury was self-inflicted. That is, Battle purportedly began to

wonder whether the gun instead had been in Cain's hand when it discharged. No documentation explains Battle's alleged supposition.

130.   It is not yet known whether Battle's scheme to concoct a murder conspiracy arose before or after this meeting between Battle and Burnes (and possibly Wallace). It is clear, however, that Burnes would shape his "opinions" in a way that advanced Battle's new-found narrative implicating Lee Clark, while simultaneously shirking his responsibilities and duties as coroner to properly investigate the cause of Brian's death.

131.   Based upon Battle's new-found supposition that Brian's death was not accidental, Battle and Wallace summoned Cain to FCPD headquarters for questioning.

### Defendants Battle and Wallace Coerce an Incriminatory Statement from Cain to Support an Involuntary Manslaughter Charge

132.   On the evening of October 20, 1996, Battle and Wallace interrogated 17-year-old Cain, who was at the FCPD alone and without the benefit of counsel. Throughout the interview, Cain consistently provided the same account that he had two days earlier, on the night of the shooting.

133.   Cain maintained that he and Brian had played Russian roulette by "cheating." That is, before they would pull the trigger, each boy would check the position of the single bullet in the chamber to ensure that it was not near the firing pin. Brian did this twice before handing the gun to Cain, who did the same thing

a single time. When Brian had the gun the next time, he placed the phone in his lap and spun the chamber with one hand while holding the gun with the other. He played Russian roulette without cheating when he fired the gun the third time.

134.    A clearly distraught Cain relayed this same account again for Battle and Wallace during the October 20 interrogation. The FCPD investigators repeatedly told Cain they did not believe him and insisted that Cain admit that he accidentally shot Brian.

135.    Through their questioning, investigators impressed upon Cain that the matter would be closed if he admitted to accidentally shooting Brian. The subtext of the interrogation, however, was that FCPD investigators would seek to charge Cain with murder if he did not acquiesce to their pressure and confess to accidentally shooting his best friend.

136.    Battle's implicit threats to Cain, designed to get him to adopt Battle's false narrative, included the following:

> "Listen to me. **We're not here to hang you for murder**. We're not here to hang you period. You accidently [sic] shot him."

> "**It was an accident, we're not gonna charge you with murder, Cain**."

> "You ain't, **we ain't gonna charge you with murder**, Cain. Accidents happen."

> "**If -- if it was an accident, we can put this to rest**. And get it over with."

"Let's put it to rest so we can all go."

"We're, we're not saying you killed him on purpose."

"Listen to me, **we're not here to hang you for murder**. We're not here to hang you, period. You accidently [shot] him. It was an accident and you shot him."

137.    Cain repeatedly replied, "No, sir" when investigators sought to have him admit that he had "accidentally" shot Brian. Alone in an interrogation room with two experienced police detectives, Cain was steadfast about what had transpired:

> It was an accident. I mean he shot hisself. [sic] I (inaudible), I didn't shoot him. I mean, I wouldn't, I wouldn't, (inaudible) I was trying to get him to g, give me the gun so I could take the shell out and put it in my pocket and go on home. He wouldn't do it. (Inaudible) I wish to God he woulda gave me, . ..

138.    Battle interrupted Cain mid-sentence to state: "Cain, you accidently [sic] shot him."

139.    Cain immediately denied that and continued with the account of what had occurred:

> No, no I did not accidently [sic] shoot him, but I swear to God, I'll swear in the face of the Almighty God, I did not accidently [sic] shoot, I was sitting here like this, looked at him, and he shot hisself [sic] in the head. I did not shoot him. I (inaudible) shoot my best friend, not even on a accident. I wouldn't even (inaudible) I wouldn't kill my worst enemy much less my best friend in the whole world.

140.    Battle persisted, making no pretense of any effort to interpose questions but simply pressing Cain on what investigators wanted him to admit: "It was an accident . . . and you accidently [sic] shot him."

141.    Cain resisted and continued to truthfully deny that he had accidentally shot Brian or that the gun was in Cain's hand when it discharged:

> No, I didn't accidently [sic] shoot him. I mean, I did not pull the trigger. He pulled the trigger. (Inaudible) I mean, I'll be, I'll, I'll, I'll say its my fault that I had the gun on me at the time, yes. I, I mean, I live, I live with that every day of my life. I can't even sleep at night cause I seen him shoot hisself. [sic] (Inaudible) he, he pulled the trigger (inaudible). He, he's the one that pulled the trigger.

142.    Wallace willingly participated in the pressure campaign to have Cain falsely admit to an accidental shooting of Brian. He added: "Accident -- accidents happen every day. But we gotta get to the bottom." Wallace went into the interrogation with information that is not documented. For instance, he interrupted Cain at one point to insist, "The wound was closer."[14]

143.    Cain, on multiple occasions, told investigators, "I did not shoot him" and "the gun wasn't even in my hand when this happened."

144.    The officers continued to harangue Cain, not with inquiries or attempts to obtain Cain's version of events, but to make clear to the boy what he

---

[14]    This inadvertent admission by Wallace directly contradicts a later narrative that FCPD investigators would push, one that had Lee improbably firing the fatal shot through the window while outside the residence.

needed to say to make the interrogation stop. On nearly two dozen separate occasions, Battle and Wallace presented the scenario of an accidental shooting by Cain as the only way he could avoid a murder charge.

145.    Eventually, Cain saw the only opening that Battle and Wallace would allow him and responded, "If I accidentally shot him."

146.    Battle responded: "If it was an accident? We're not going to charge you with murder, Cain."

147.    At that point, Cain finally acquiesced and mimicked what Battle and Wallace told him needed to be said. Cain meekly offered, "It was an accident. . . . I accidently [sic] shot him."

148.    The statement that Battle and Wallace coerced from Cain on the evening of October 20, 1996, formed the basis of the charges originally launched against Cain and thereafter served as the springboard for the case that they would concoct against Lee Clark.

### FCPD Investigators Set About Creating a Conspiracy Case Against Clark

149.    Immediately after coercing Cain's admission to an accidental shooting of Brian, investigators (Battle and Wallace) charged him with involuntary manslaughter. Cain was arrested for that offense at 7:35 pm on October 20, 1996.

150.    The Statement of Criminal Charges ("Statement") contains a section for a "Detailed Description of Offense" which reads as follows:

Above subject [Cain] caused the death of Brian Bowling unintentionally by shooting victim with Smith & Wesson .38 caliber revolver.

151.    The Statement lists Battle as the Affiant-Officer and Wallace as the Witness. Based upon this affidavit, the investigation should have been closed at that point, with the involuntary manslaughter charge.

152.    Investigators, however, soon conjured a much more salacious and sinister tale of wrongdoing. The precise reason why investigators chose to pursue charges beyond the original involuntary manslaughter charge against Cain is not yet known with certainty. What is clear, however, is that no evidence justified any additional charges, and that Battle and Wallace acted intentionally and/or recklessly and in bad faith.

153.    Based upon the record evidence, it is likely that Battle's motivations were tied, at least to some extent, to his interests in pursuing sexually both (i) a family member of the decedent (Brian's aunt, Melody Robinson), and also (ii) a key witness in the case (Angela Bruce).[15] Battle's documented disdain for Lee Clark also cannot be discounted as playing a role in his decision to pursue a murder

---

[15]    It must be noted that Battle and Stewart were both ultimately terminated by Floyd County and the FCPD following very public on-the-job sexual dalliances. These were not isolated incidents. Indeed, Battle contested his termination and proclaimed that other FCPD officers had done the same and not faced any repercussions. The misconduct was not limited to sexual indiscretions but rather suggest a culture in which FCPD officers did not feel constrained by any policy or legal limitations on their actions.

conspiracy charge involving Lee despite the complete lack of evidence to support same.

154.    Regardless of their motivations, there existed no rational basis for FCPD investigators to pursue a murder charge against Lee. No reasonable law enforcement officer could or would have believed such to be proper and these Defendants likewise knew or reasonably should have known that the charges were unwarranted.

155.    Through coercion and deceit, FCPD investigators manufactured a murder conspiracy case against Lee Clark. And such misconduct was not unique to this case. The record demonstrates that Battle in particular simply did not have the requisite character and integrity to serve as a police officer and would baldly ignore the ordinary legal and constitutional constraints of his office. By way of example:

(a) Battle and Stewart were involved in one incident, occurring in 1999, in which a handcuffed suspect was removed from a patrol car by them and then subjected to excessive force.

(b) In another instance, the Georgia Supreme Court held that Battle had made materially false statements in procuring a search warrant.[16]

---

[16]     *See Harper v. State*, 657 S.E.2d 213, 216 (Ga. 2008) (Battle's misstatements regarding source and supposed reliability of information forced State to concede on appeal that warrant he had obtained was invalid and not supported by probable cause). The excessive force incident referred to in this paragraph is a different one from that which is referenced *infra* and led to the Eleventh Circuit's pronouncement that Battle committed excessive force as a matter of law. *See Coffman v. Battle*, 786 Fed. Appx. 926, 932 (11th Cir. 2019). The earlier incident occurred in October 1999 and also involved Defendant Stewart.

(c) Battle was terminated by the FCPD in 2007 following a highly publicized incident in which he was recorded having sex with one of his confidential informants. The woman in question asserted that she recorded the encounter due to her fear of Battle.

156.    Floyd County and the administration of the FCPD were well aware of the improper and overreaching tactics employed by FCPD officers and investigators. They were likewise cognizant that witnesses were coerced, enticed, and coaxed into providing witness statements and testimony to support FCPD investigations. The result was wrongful prosecutions and wrongful convictions, including but not limited to this one.

157.    As alluded to above, one potential cause of Battle's desire to criminally charge Lee relates to Battle's personal animus toward him. At a bare minimum, Battle's dislike of Lee blinded him to the obvious facts that negated any possibility of Lee's culpability for Brian's death.

158.    Specifically, there had been a series of run-ins between Lee and various FCPD officers in general and Battle in particular. Battle and other FCPD officers would hassle Lee and other teenagers, often for no legitimate reason and with threats. Lee and some of his friends would in return taunt Battle and FCPD officers and act disrespectfully toward them. Battle, more so than other police officers, took the teens' words and lack of respect personally and displayed animus towards Lee.

159.    Battle suspected Lee with respect to several minor property crimes (thefts and burglaries) in Floyd County. Lee had, in fact, committed some of those burglaries, though he denied involvement when confronted by Battle.

160.    In 1996, Lee was 17 years old, and, by his own admission, he was a "smart-assed teenager." When Battle confronted Lee about the petty thefts in which Lee was involved, Lee smarted off to him. He said, "I ain't out here doing no burglaries. But if I was, I wouldn't let no stupid motherfucker like you catch me." Battle swore that he was going to get Lee one day. The tragic circumstances of Brian Bowling's death provided Battle with the opportunity to do so.

161.    Though Lee was not at the Bowling residence on the night Brian was shot – and no one claimed he had been – Lee was friends with the only person who was in Brian's bedroom at the time, Cain.

162.    In addition, on October 3, 1996, just three weeks earlier, Cain and three friends – Joseph Wilkins, Pete Jordan, and Lee – took a safe that belonged to Cain's father James. They broke it open with the aim of dividing the $3200 in cash in the safe among the four of them. The foolhardy scheme fell apart the very same day it was hatched and carried out.

163.    Cain and Joseph were arrested and charged with the safe theft on October 3, 1996. Both were remorseful and forthcoming, and they hurriedly named

the other two boys involved, Pete Jordan and Lee, who were arrested and charged with the theft on October 7, 1996.

164.   Brian was *not* involved in the safe theft and had no personal knowledge about it. Brian did not provide any information that led to the other boys' arrests, and they had no motive for any alleged "revenge" against Brian.

165.   FCPD investigator Stewart *did* speak with Brian (along with Cain) on October 11, 1996, but only to ascertain where Lee was living at the time. The safe theft investigation had been closed with arrests of all involved and full confessions of two of the four participants days in advance of that brief conversation.

166.   From this slimmest of reeds, Battle and his compatriots would imagine and invent a merciless "gang" of teenagers that ran wild in Floyd County, one that would exact revenge on members who dared violate their strict rules with "execution style" murders, and which had murdered young Brian for snitching on Lee and Cain for the theft of the safe.

167.   The story of a gang-related revenge killing was utter fiction. No evidence supported it and Battle and other FCPD investigators knew this. Defendants were undeterred, though. The absence of any evidence (or motive) meant only that Battle and FCPD investigators would need to manufacture it.

168.   Though no investigative records or notes were made or kept, it appears that Battle and Stewart decided they would manufacture a conspiracy and

murder case with Lee as their target soon after charging Cain with involuntary manslaughter.

169.    Their scheme was fueled, at least in part, by disdain for Lee, but also had a practical component to it: they knew that no one would believe that the mild-mannered Cain would, on his own, enter his best friend's bedroom (in a home in which Cain sometimes himself resided) and shoot Brian in the head. Instead, Defendants would cast Lee as the true villain, the mastermind of a conspiracy to commit a cold-blooded murder of a 15-year-old kid while his family watched television in the next room.

170.    To shift the explanation of Brian's death from their original (and accurate) conclusion of an accidental shooting to a gang-related retribution murder, Defendants needed to create something they could label a gang, and they needed to create a role for Brian in this imagined gang. Starting with rumor and innuendo and ending with fabricated witness statements, Defendants spun a tale of a ruthless gang ready to commit murder and mayhem amid the rural environs on the outskirts of Rome, Georgia. Throughout this scheme, Battle and Stewart played on the Bowling family's desperate bid to comprehend their son's tragic death and their understandable reluctance to face the fact that the fatal gunshot was self-inflicted.

## **The Exhumation of Brian Bowling's Body**

171.    Brian Bowling was laid to rest on October 22, 1996.

172.    Cain had originally been selected to serve as a pallbearer, but the family rescinded that offer at some time around Cain's arrest for involuntary manslaughter. Also, by this point Lee had heard rumors, either started or fueled by Battle and FCPD investigators, that he was suspected of somehow being involved in Brian's death, and for that reason decided he should also not attend Brian's funeral.

173.    Another friend of Brian's, Joseph Wilkins ("Joseph"), *did* attend the funeral and was aware and upset that others from their group of friends would not be able to say their final goodbyes to Brian.

174.    Joseph, a thoughtful, creative, "artsy" kid, drew a picture that he wanted to place in Brian's casket. The drawing featured an eagle smoking a marijuana joint and carrying a flag with the term "Free Birds" on it and a baggie of marijuana (hereafter "Joseph's drawing").

175.    Below the eagle were the handwritten words, "Brian, We're gonna miss you. Fly high! With sweet love, the Free Birds. P.S. See you at the Crossroads!" (misspelling and grammar corrected).

176.    It is apparent from the face of the drawing and the accompanying text that there was nothing menacing in any part of the message. The note was plainly

intended to be a sincere and loving goodbye to a friend who had tragically left this life too soon.

177.   At the funeral, Joseph showed his drawing to Brian's mother, Debra Bowling, and asked her permission to place it in the casket. Debra Bowling commented favorably on the drawing and allowed it to be placed in Brian's casket, along with mementos and flowers from other friends.

178.   Over the next few weeks, due to Defendants' actions and the rumors spread and fueled by them, Joseph's drawing was transformed into something cruel and sinister. It became a "message" or "calling card" of a gang, a final taunt to the victim of their retribution killing. This transformation of a drawing made as a genuine expression of love to a deceased friend became something altogether different due to the actions and words of Battle and FCPD investigators.

179.   Within just a few weeks of Brian's tragic death, FCPD investigators had persuaded Brian's family that his death was not an accident but instead was "premeditated." Battle and FCPD investigators caused the Bowling family to have Brian's casket exhumed for purposes of "examining the casket for items left there by unknown persons which indicate that Brian's death was premeditated versus an accidental or spontaneous act."

180.    A letter dated November 19, 1996, was prepared on FCPD letterhead and signed by Brian's parents, Debra and Rocky Bowling. It read in pertinent part as follows:

> I, Debra Bowling, the mother of Brian, did see a document inside my son's casket on the date of his funeral which, in part, indicated that my son was affiliated with a gang and that one of the by-laws of that gang was that any person who "ratted" on another gang member was subject to the penalty of death. I further know that my son, Brian, had co-operated with the Floyd County Police Department in the days and weeks prior to his death regarding a burglary wherein a safe containing $3200.00 was taken and that, based in part on Brian's assistance, the Floyd County Police Department did arrest those responsible for this crime. Furthermore, the person currently accused of Manslaughter in connection with my son's death is Cain Joshua Storey, who was one of those arrested for the burglary and safe theft, was a "friend" of Brian's and, along with others, is believed to be a member of this gang known as the Free Birds. After reading this document I replaced it in Brian's casket and did not report it to the authorities until some time after the funeral.

181.    Upon information and belief, the letter requesting the exhumation of Brian's casket was written by Battle, with the assistance of other FCPD investigators.

182.    The statements that FCPD investigators attributed to Rocky and Debra Bowling about Brian helping solve the safe-theft crime were false, and Defendants knew the statements were false. All four participants in the theft had been promptly charged and arrested without any involvement by Brian.

183.   Furthermore, there was no "gang," and mislabeling this group of young friends as such was a deliberate falsehood. These rural high-school boys were, at best, a loose-knit group of teenagers who enjoyed shared interests and had friends in common. They had no "Code" and no "set of rules," and there was never any talk of a penalty of death for anyone who spoke with a police officer.[17]

184.   The term "Free Birds" was used by Joseph in his note to Brian and may have been used self-referentially on occasion by Brian and Cain, as well, but only in the context of a "concept" (i.e., "we're free as the birds") or a potential band name, or as a statement of affinity with the southern rock band and the song from which the name was taken.[18]

185.   The only purpose of the exhumation of Brian's body and the search of his casket was to further Defendants' plan to manufacture a motive for a

---

[17]   During an interview for the *Proof* podcast about the Brian Bowling investigation, former FCPD officer Mark Corbin was asked what he remembered about a potential gang in the Rome/Silver Creek area. Corbin was dismissive, saying he'd heard something but concluded "it wasn't a legitimate gang I don't think." *Proof* podcast, episode 3. Compared to the Bloods and the Crips, the "Freebirds" does not sound much like a "gang" that would inspire fear or engage in mayhem or murder.

[18]   The Lynyrd Skynyrd song "Free Bird" might well have captured what Joseph felt about his friend Brian's death:

If I leave here tomorrow, would you still remember me?
For I must be traveling on, now, 'cause there's too many places I've got to see.
Cause I'm free as a bird now, and this bird you cannot change.
Bye-bye, baby, it's been a sweet love, yeah-yeah, though this feeling I can't change.
But, please, don't take it so badly, 'cause Lord knows I'm to blame.

supposed gang revenge killing. That purported motive, the existence of a gang with rules enforceable by death, and a conspiracy involving Brian's 15-year-old girlfriend and two of his best friends, both 17 years old, were all fiction and invented by Defendants.

## Dallas Battle Alters Joseph's Drawing

186.    Brian Bowling's casket was exhumed on or about November 22, 1996. No family members were present for the exhumation or search of the casket. The exhumation was attended by Coroner Craig Burnes and a small number of FCPD investigators, including Battle.

187.    FCPD personnel present for the exhumation included Sgt. Mark Wallace, Capt. Tommy Shiflett, and Sgt. Greg Carney. Upon information and belief, Joseph's drawing was removed from the casket by Carney and immediately provided to Battle.

188.    Upon information and belief, FCPD investigators made a list of the other items that had been placed in the casket by Brian's family and friends. Joseph's drawing was listed as follows: "Pencil drawn picture – Joseph Wilkens" [sic].

189.    The version of Joseph's drawing that was introduced at trial and which was used to foster the narrative that Brian's death was a gang-related revenge killing is reproduced below.



190.    Upon information and belief, the word "NARCS" with the slash through it to convey "no narcs" was *not* written by Joseph Wilkins.[19] That part of the drawing was added by Defendant Battle after the exhumation of Brian's casket.

---

[19]    The red box surrounding the word "NARCS" does not appear on the document admitted as an exhibit at trial and was added for the purpose of focusing the reader's attention on that portion of the Wilkins drawing.

191.    The FCPD investigative file for the Brian Bowling matter contains no notes or records of any interview of Joseph Wilkins. Defendants knew that, if shown to him, Joseph would truthfully deny writing the "no narcs" message on the drawing that he intended as an expression of love and friendship. For that reason, Defendants made the deliberate choice not to interview him regarding his drawing, Brian's death, or what, if anything, he knew about what the term "Free Birds" and what it meant to him and others.[20]

192.    Defendants furthermore took steps, through conveying rumors and false messages about Joseph's safety, so as to encourage his family to withdraw him from school and send him to live with relatives in a distant part of the state through the time of the underlying criminal trial.

193.    At trial, when the import of investigators' "no narcs" message became clear, the judge was mystified that the supposed author of that note would not testify – "[T]he guy who drew this note [won't testify?] . . . well, that's strange."

194.    The "no narcs" message that Defendants added to Joseph's drawing would prove to be a critical part of the police story of a gang revenge killing. Though there was not a shred of actual evidence to support it, Defendants would

---

[20]    Joseph was interviewed in connection with the *Proof* podcast and denied having written the "no narcs" message on the drawing placed in Brian's casket.

spend considerable time and effort in furtherance of their plan to concoct a murder conspiracy with Lee at the center of it.

### Defendants Battle and Stewart Search for Witnesses to Support their Conspiracy Story

195.    The conspiracy narrative on which Lee was charged, tried, convicted, and wrongfully imprisoned for 25 years was nothing more than a fiction created by FCPD investigators, led by Defendants Battle and Stewart. From the outset, Defendants themselves fomented "rumor and innuendo" of some sinister plot and coerced or fabricated witness accounts and identifications to cite as supporting "evidence."

196.    In the immediate aftermath of Brian Bowling's tragic death, rumors *did* swirl in the rural communities outside of Rome. Upon information and belief, FCPD investigators, including primarily Battle, initiated some rumors and fueled others about Brian's death, supposed gang activity in the area, and a purported link between both the safe theft and "a Free Birds gang" and Brian's shooting.

197.    An article ran in the *Rome News-Tribune* approximately one week after Brian's death. Captain Tommy Shiflett was quoted as saying that the FCPD was investigating "rumors that the shooting may be connected with a recent theft involving Storey." In truth, it was Battle who was instigating and spreading stories connecting Brian's death to the safe theft and a supposed "gang" called the "Free Birds."

198.   The quotes and stories provided to local media, along with unrecorded statements and questions directed to individuals in the community, were part of a deliberate plan by Defendants Battle and Stewart to fan the flames of rumor, innuendo, and speculation. Based upon past experience, these investigators knew that if they launched a particular narrative toward certain segments of the community, their efforts would yield potential "witnesses" willing to attest to parts or all of that desired – but fictionalized – narrative.

199.   Upon information and belief, FCPD investigators, primarily Defendants Battle and Stewart, began searching for individuals who could be persuaded, pressured, or coerced into furthering investigators' story that Lee was involved in Brian's death and that the shooting was not accidental.

200.   Defendants Battle and Stewart resorted to familiar tactics when searching for compliant storytellers – they disseminated word among those in jail or otherwise at risk of criminal liability. These Defendants deliberately sought out those over whom they could assert leverage and those who would parrot a story fed to them by investigators in exchange for some personal benefit or to otherwise curry favor with law enforcement.

201.   In this case, like in many others, FCPD investigators employed a regular practice of placing fliers at the Floyd County Jail in which they purported to seek out persons with knowledge regarding the incident in question.

Investigators made it known that anyone providing helpful information could expect to receive favorable treatment with respect to criminal charges and sentencing, as well as other economic benefits.

### Defendants Battle and Stewart Coerce Inculpatory Statements and a Witness Identification from Angela Bruce

202.    Despite their persistent efforts to manufacture a murder conspiracy case against Lee, months went by with Defendants unable to weave even a tenuous thread between Lee and Brian's death. Investigators' fortunes changed, however, when a search for an unrelated individual wanted by authorities led Defendants Battle and Stewart to the home of Angela Bruce ("Angela").

203.    The FCPD investigative file contains two recorded interviews of Angela: (i) the first taken by Defendants Battle and Stewart at 10:33 pm on the night of May 16, 1997; and (ii) another taken by them at 5:20 pm on May 22, 1997.

204.    There are no other interview notes or other records related to Defendants' interactions, interviews, and conversations with Angela. It is clear from both the transcripts of those two interviews and Angela's statements many years later that Defendants Battle and Stewart spoke with Angela on numerous occasions for which no record exists.

205.    As of May 1997, Angela lived at the McHenry Trailer Park on the outskirts of Rome. It was Angela's third home near Rome since she'd moved to the area a little more than a year earlier. She was a single mother who'd had brushes

with the law and child welfare authorities. Angela had been jailed in prior months on child neglect charges and, upon information and belief, was a drug user and struggled with substance abuse issues. Her history and habits made her particularly susceptible to Defendants' pressure campaign.

206.   Though the details are unclear due to Defendants' deliberate and intentional failure to make or keep investigatory notes, upon information and belief, one or more FCPD investigators visited Angela's home in May 1997 while searching for a man that law enforcement officials knew or suspected was at Angela's trailer. Upon information and belief, either at this initial visit to see Angela at the McHenry Trailer Park, or soon thereafter, FCPD investigators made it known to her that they were aware of a party she had hosted three months earlier, in February 1997, at which teenagers were present and underaged drinking occurred. FCPD investigators threatened Angela with criminal charges and with having her children taken from her by child welfare authorities.

207.   FCPD investigators Battle and Stewart made a habit of visiting Angela's home both frequently and late at night. The recorded interview taken of Angela by Battle and Stewart at 10:33 pm was typical. Stewart made overt threats to have Angela's children taken from her if she did not cooperate with respect to the Bowling investigation. Battle sought sexual and/or romantic liaisons with

Angela. Both Battle and Stewart pressured her to provide a false statement linking Cain and Lee to a premeditated murder of Brian.

208.   Due to Defendants' coercion, Angela complied. Fearing that FCPD investigators would follow through on their threats to have her children taken from her, Angela parroted the gang-related revenge killing story that had been concocted by Battle and Stewart.

209.   In the May 16, 1997, statement, Angela asserted in substance the following: (i) Angela hosted a party at her home in the McHenry Trailer Park on the first Friday of February 1997; (2) Cain Storey was one of the 15 to 20 party guests, along with his uncle Phil Storey and a cousin called "Smitty"; (iii) Cain and one of his friends boasted about placing a pillow over Brian's head and killing him "execution style"; and (iv) the boys were in a gang that didn't "let nobody out alive."[21] During this version of the story, Angela asserted that she chased Cain and this other boy out of her trailer at knifepoint. According to Defendants Battle and Stewart, Angela identified this other boy as Lee in a photo array shown to her on May 16, 1997.

---

[21]   At page 7 of the transcribed statement, it appears that Angela must be searching for details she had been fed about the safe theft and the "gang." Stewart then asked her, "Did you hear about the, hear about a word called freebird?" Investigators continued to ask Angela questions about "the Free Birds gang." Not surprisingly, Angela was able to stick to the script by the time of trial.

210.   Angela's story changed slightly during her May 22, 1997, interview. The salient details referenced above regarding the party and Cain and Lee bragging about the gang-related execution-style killing of Brian after a pillow had been placed over his head remained the same. At Defendants' urging, however, Angela added new "facts" with the intent of implicating Brian's 15-year-old girlfriend in the murder conspiracy.

211.   This was done for two reasons. First, Defendants needed a means to neutralize Caprice's statements (e.g., hearing Brian say, "I'm playing with Josh's gun" and "I'm playing Russian roulette") because they knew Caprice's account was both truthful and believable. Second, they thought that a 15-year-old facing a potential murder charge would buckle, change her story, and say what investigators wanted with respect to inculpatory statements about Lee.

212.   Defendants decided to include Caprice in their fiction of a murder conspiracy so that Caprice would be an unindicted co-conspirator, and the prosecutor could tell a jury to disregard her testimony. They also hoped that Caprice would feel the pressure of potential criminal liability and agree to falsely implicate Lee.

213.   In the second statement that Defendants Battle and Stewart coached Angela through, the 15-year-old Caprice played a central role in the alleged murder conspiracy. In this telling, Caprice sent a "code" to Lee via a "pager" or a

"beeper" to let him and Cain know that Brian was home, so they would know that he was there, and they could "go ahead with their plan to kill him." This version of the story had a blonde-haired Caprice arriving in a little blue or black car that she drove there and knocking on Angela's door to ask for Cain and Lee.[22]

214.    The statements attributed to Angela were not truthful or voluntary. They represented a fictionalized account created by Defendants for the sole purpose of wrongfully instituting criminal charges against Lee.

## Defendants Charge Lee with Murder and Conspiracy to Commit Murder Without Probable Cause to Support the Charges

215.    On May 23, 1997, one day after the second interview with Angela Bruce, Battle swore out criminal warrants and arrest warrants, charging Lee with murder and conspiracy to commit murder.

216.    The Affidavits for Arrest completed by and sworn to by Battle were based entirely upon false, fabricated evidence. Battle presented the charging documents to a magistrate with knowledge both that the information contained

---

[22]    As of May 1997, Caprice was 15 years old and did not have a driver's license. When she eventually had a car to drive, it was not blue or black. She did not have blonde hair. Caprice had no prior relationship with Cain or Lee. She had spoken to Cain by phone on a couple of occasions when talking with Brian, but first saw him at the hospital on the night of the shooting. The first time Caprice and Lee saw each other was at trial; they had never spoken.

therein was false and that there was no probable cause to initiate criminal proceedings against Lee or to seize him.

217.    The Affidavits for Arrest for the crimes alleged included the following offense descriptions:

> Accused did commit the offense of Murder, Parties to a Crime, when by having knowledge that a Murder was being committed and assisted Cain Joshua Storey in the Murder of Brian Bowling that shot victim in the head causing death.
>
> Accused did commit Conspiracy to commit Murder, when by conspiring with Joshua Storey to kill Brian Bowling. The victim was the only witness that could testify against the accused and Joshua Storey in a burglary they participated in at the residence of James Storey at 50 Pleasant Hope Road in Silver Creek, Georgia on October 3, 1996.[23]

218.    Similar charging documents and arrest warrants were also issued as against Cain on that same day.

219.    Lee and his family learned on May 23, 1997, that arrest warrants had been issued against him. Lee's father, Glenn Clark, drove Lee to the Floyd County Police Department to ascertain what warrants had been issued and to straighten out the matter. Glenn Clark watched his son enter the FCPD and waited in the

---

[23]    The error with the purported offense date is contained within the charging documents. The subject shooting occurred on October 18, 1996. Defendants Battle and Stewart repeated the use of the incorrect date in the Incident Report related to the arrests of Lee and Cain. The Affidavits are quoted verbatim.

parking lot for his son to return. It would be the last time he would see Lee as a free man for more than 25 years.

220.    Defendant Battle took affirmative steps to ensure that Lee was denied bail and that he would remain in custody, falsely asserting to the magistrate and other authorities that Lee was a flight risk. The FCPD Incident Report related to the arrest of Lee was completed by Defendants Stewart and Battle and included the following:

> The listed incident offender along with Cain Joshua Storey was arrested for the murder of Brian Bowling from a 1996 October 20th shooting where Bowling was shot in the head.

> The murder of Bowling stemmed from a safe theft incident that occurred on October 3rd at the residence of Cain J. Storey.

> Murder warrants was [sic] obtained on Clark and Storey after an intense month long investigation of statements and facts corroborating previous suspicion and rumor.

> FCPD investigators along with numerous officers from different regional law enforcement agencies searched for Clark after receiving word that the suspect was leaving the State of Georgia.

> Word was reported, through Lee Clarks [sic] mother, that Clark had seen his mother after warrants were taken and had come to say goodbye because he was leaving Georgia for the State of Alabama. Officers searched for Clark for approximately (8) hours prior to Clark being turned over to sheriff deputies by his mother and father.

> Cain Storey was arrested in Henderson Tenn after he was located at a relatives [sic] house. Storey left his residence for

Tenn. approximately (2) hours prior to arrest warrants being taken.

221.   Defendants knew that the statement asserting that Lee was preparing to flee the state because of his impending arrest was false. May 23, 1997, was the Friday of Memorial Day weekend. Lee had plans to travel to Alabama with friends for the holiday weekend, but not to avoid arrest. There was no search for Lee, and he was not coaxed into turning himself in. As set forth above, Lee and his father went to FCPD to find out what was going on as soon as they heard that some warrant had been issued for Lee. Likewise, Cain had not fled the state to avoid arrest. He had traveled to Tennessee to visit with family.

222.   Upon information and belief, the false statements asserting that Lee was a flight risk and that he and Cain had plans to flee the state to avoid arrest were communicated to the magistrate and the prosecutor by Defendants Battle and Stewart with the intent that Lee be denied bail and any chance at pre-trial release. As a result of Defendants' actions and falsehoods, Lee was in fact denied bond and remained in jail from the time of his arrest on May 23, 1997, through his trial in January 1998.

223.   Spinning the false narrative about Lee and Cain allegedly fleeing the jurisdiction so as to influence the bond decision was not simply malicious, it also served two practical purposes. First, Defendants would publicize the apprehension of Lee and Cain after having fled or preparing to flee Georgia to

shape the public narrative and the jury pool's view of the boys. Second, FCPD investigators had a well-documented pattern and practice of recruiting jailhouse informants. With Lee locked up in the Floyd County Jail for months awaiting trial, Defendants knew they would greatly increase the number of potential snitches who could plausibly say that they had some contact with him.

224.    Defendant Battle personally effected the arrest of Cain in Tennessee and drove him back to Georgia. During the ride, Battle made clear that his true target was Lee, and Battle told Cain that Battle would help get Cain's sentence reduced if he testified against Lee (e.g., "We'll give you a 20, you do 10.").

225.    No probable cause supported either the arrest warrant issued against Lee or his seizure. Absent Defendants' fabrication of evidence, no arrest warrant would have been issued and Lee's arrest and seizure would not have been sanctioned by any honest magistrate or prosecutor.

226.    As part of their campaign to spin a public narrative of a gang-related execution-style killing of Brian Bowling, Defendants Battle and Stewart continued to propagate rumors and falsehoods about the shooting and about Lee and Cain, as well as the fictional "gang" called the Free Birds. They told the story to inmates at the Floyd County Jail, fanned the flames of rumor in the community, and provided false statements to the media.

227.    Another article about the case ran in the May 25, 1997, edition of the *Rome News-Tribune* titled, "Police Say Case is Now Murder." In connection with that article, FCPD investigators referred to the safe theft, items from Brian's casket that were a "benefit" to the investigation and having arrested Cain in Tennessee.

## Defendants Attribute Fabricated Statements to Charlie Childers to Bolster the False Charges Against Lee

228.    On May 26, 1997, Defendants Battle and Stewart met with Wayne and Charlie Childers at their residence. Though both of the Childers brothers were at the Bowling home on the night that Brian was shot, FCPD investigators had never previously interviewed them.

229.    Defendants Battle and Stewart would testify at Lee and Cain's trial that Wayne Childers contacted investigators to report that his brother Charlie had information about the case. That report in the FCPD investigative file, and that testimony were both false. In reality, Defendants Battle and Stewart initiated contact with the Childers brothers and did so with the intent of fabricating a statement that would be attributed to Charlie Childers ("Charlie").

230.    FCPD investigators knew that Charlie was hearing-impaired. They also knew or should have known that communication with Charlie was exceedingly difficult. Further, they also knew or should have known that his brother Wayne would be of very limited help. Charlie had a reading level at approximately the second-grade level; Wayne was illiterate. Neither was

proficient with standard American Sign Language ("ASL") signing. Charlie had attended the Georgia School for the Deaf for a brief period as a child before his mother removed him from the school.

231.   Because Charlie had extremely limited exposure to any other hearing-impaired people and he and his family did not use ASL signs, Charlie never fully learned how to sign and communicate with others. He and his family used a few gestures, called "home signs," to communicate in a very rudimentary fashion.

232.   Notwithstanding the communication difficulties referenced above, Defendants Battle and Stewart met with the Childers brothers briefly on two occasions on May 26, 1997. During the first interaction, Defendants purported to obtain an account from Charlie of seeing a boy run in front of the Bowling residence soon after the others at the Bowling home rushed toward Brian's bedroom upon hearing the gunshot. At the second meeting, Defendants purported to obtain Charlie's identification of Lee as the boy who ran by the house in the dark that night.

233.   Defendants Battle and Stewart fabricated this inculpatory evidence. Charlie did not see anyone run in front of the Bowling residence on the night Brian was shot, and Charlie did not identify Lee as ever being near the residence, not that night nor on any other occasion.

234.    A photo array with Lee's photo circled and a Witness Line-Up Identification Form ("ID Form") with an indication of Lee's position in the photo array as #2 and signed by Charlie were both introduced as evidence at trial. The ID Form was signed by Defendants Battle and Stewart. Both Defendants knew or should have known that Charlie did not see Lee near the Bowling residence on the night of October 18, 1996, and that Charlie did not indicate in any way that he had seen Lee that night. Defendants knew that the purported witness identifications that would be attributed to Charlie were completely false.

235.    Defendants knew that the fabricated evidence in the form of Charlie's purported witness identification and his statement would be used at trial against Lee. Defendants deliberately, and in bad faith and with malicious intent, concealed the true facts surrounding their interactions with the Childers brothers.

236.    At trial, it became apparent that Charlie's communication issues were so extreme that his testimony was unintelligible. As a result, Battle used the fabricated witness identification documents that he attributed to Charlie to essentially testify for Charlie and to tell the false story which Defendants had attributed to him.

237.    Though Charlie did not see Lee anywhere near the Bowling residence on the night Brian was shot, and never said that he had, Defendants fabricated evidence (e.g., the ID Form, marked photo array, and a story attributed to Charlie)

with knowledge that such false evidence would be used as inculpatory evidence in the criminal prosecution of Lee.

### A Grand Jury Indictment Against Lee is Procured Based Upon the False Evidence Fabricated by Defendants Battle and Stewart

238.    On August 8, 1997, Lee was indicted by a Floyd County grand jury on charges of murder and conspiracy to commit murder. The same charges were lodged against Cain, in addition to an involuntary manslaughter count. Caprice was named as an unindicted co-conspirator on the conspiracy count.

239.    The Indictment was not supported by probable cause nor any showing of criminal conduct whatsoever with respect to Lee. The showing made to the grand jury to secure the Indictment against Lee consisted entirely of false evidence fabricated by FCPD investigators, including Defendants Battle, Stewart and Wallace, along with Defendant Burnes.

240.    In the absence of Defendants' fabrication of evidence, no charges against Lee would have been submitted to the grand jury and Lee would not have been indicted and wrongfully prosecuted and convicted.

241.    Upon information and belief, Defendants Battle and Stewart testified before the grand jury and presented false and fabricated evidence against Lee for the purpose of wrongfully securing an Indictment against him.

242.    The list of potential witnesses during the grand jury proceedings in which an Indictment was procured against Lee included jailhouse informants who

had been recruited by Defendants Battle and Stewart to make false accusations against Lee and Cain. Defendants knew these individuals were not aware of any evidence that inculpated Lee.

243.    Defendants Battle and Stewart had a pattern and practice of recruiting jailhouse informants to provide false statements against criminal defendants. Floyd County, the FCPD Chief of Police, and leadership within the FCPD were aware of this pattern and practice of coercing or enticing inmates and others facing criminal charges to provide false testimony against criminal defendants, and condoned and ratified the practice with knowledge that the presentation of false evidence and wrongful prosecutions would result.

244.    Following issuance of the Indictment of Lee, Defendants continued with their efforts to manufacture false inculpatory evidence against him through entreaties to potential jailhouse informants, pressure and coercion applied to Angela Bruce and fueling the community rumor mill with conspiracy theories.

245.    Another article about the case ran in the August 18, 1997, edition of the *Rome News-Tribune* titled "Two Teens Charged with Murder." The following statement was attributed to Battle: "All of the boys were part of a loose-knit gang in Floyd County, in northwest Georgia, whose members called themselves the 'Free Birds.' Several members had been convicted of burglaries and thefts in the area."

246.    In the same article, Battle was quoted as saying, "He [Brian] told his mother what he had seen. She called us, and he ratted out Clark and Storey."

247.    Those statements were false and FCPD investigators, including Defendants Battle and Stewart knew the information was false. There was no gang, and none of the boys in the friend group that included Brian, Lee, and Cain had been "convicted of burglaries and thefts." Nor had Brian "ratted out" anyone.[24]

248.    Defendants' false statements to the press and to others in the community were part of a deliberate plan to spread the bogus narratives about a (i) ruthless gang running rampant in rural Floyd County; (ii) the supposed connection between the safe theft and Brian's death; and (iii) that this gang's "Code" required the execution of any member who dared quit or talk to the police. There was no truth to the falsehoods propagated by Defendants, but they knew that at the end of the day the truth would matter little, particularly if it remained as Defendants intended.[25]

---

[24]    As set forth above in paragraph 165, the one occasion on which Brian spoke with any FCPD investigator (Stewart) that was in any way related to the safe theft occurred on October 11, 1997. Cain was next to Brian during the interview, and Stewart merely inquired as to Lee's residence at the time. This, of course, was a week after both Cain and Joseph had provided complete confessions regarding the safe theft, naming all four boys involved. Upon information and belief, the safe theft was not prosecuted.

[25]    A wise man once remarked, in a quote commonly attributed to Mark Twain, "A lie can travel halfway around the world while the truth is putting on its shoes." Defendants were well-versed in the art of deception.

249.    After the Indictment against Lee was issued, Defendants Battle and Stewart continued with efforts both to shape the perceptions of the Bowling family and the public about the case and to control what evidence – both actual and fabricated – was provided to the prosecutor.

250.    An article about the upcoming trial ran in the January 8, 1998, edition of the *Rome News-Tribune,* just four days before the trial was to start. The piece repeated both the fiction of Brian's shooting having been related to the safe theft and the story of Cain purportedly fleeing the state to avoid arrest and having been tracked down in Tennessee.

## II.    LEE CLARK IS UNJUSTLY CONVICTED.

### Defendants Battle and Stewart Conceal Exculpatory Evidence and Cause Fabricated Evidence to be Used at Trial

251.    The criminal case against Lee was called for trial on January 12, 1998. He was represented by an experienced defense attorney, Rex Abernathy ("Abernathy"). Because Abernathy's motion to have Lee tried separately was denied, Lee was tried with Cain, who was represented by Larry Barkley ("Barkley"). The State was represented by Assistant District Attorney Steve Cox ("Cox").

252.    In preparation for trial, Abernathy opted in for "complete discovery," also known as "open file discovery." He also filed numerous pre-trial motions to

ensure that the DA's Office provided full discovery, including all materials required to be disclosed pursuant to *Brady v. Maryland,* 373 U.S. 83 (1963).

253.   Because FCPD investigators, including Defendants Battle and Stewart, knew that the DA's Office and Cox would comply with their obligations under *Brady* and its progeny, they withheld from the prosecution team substantial exculpatory evidence that was critical to Lee receiving a fair trial.

254.   Defendants concealed from the prosecutor and Lee's defense team exculpatory and impeachment evidence that included the following: (i) witness statements contradicting the story attributed to Angela Bruce; (ii) witness statements contradicting the FCPD narrative of a gang called the Free Birds that had a Code calling for the execution of any member who either sought to leave the gang or spoke with police; and (iii) witness statements and notes from the night of the shooting which corroborated the fact that Brian was playing Russian roulette and died as a result of a self-inflicted gunshot wound.

255.   Defendants also directly caused fabricated evidence to be used against Lee at trial that included the following: (i) the coerced witness statements attributed to Angela Bruce; (ii) the fabricated witness statement attributed to Charlie Childers; (iii) the purported witness identification form with an identification of Lee which was attributed to Angela; (iv) the purported witness identification documents attributed to Charlie; (v) the Joseph Wilkins's drawing

that was altered to further the fiction that Brian was the victim of an execution-style gang revenge killing; and (vi) a falsified coroner's report that purported to establish that the gunshot that killed Brian Bowling was fired from a distance and thus could not have been self-inflicted.

256.    Defendants, aware of their obligations under *Brady* as well as their duty not to fabricate evidence, continued with their plan to have Lee tried on the basis of fabricated evidence and with exculpatory evidence wrongfully concealed up to and through trial.

## Defendants Cause Angela Bruce and Charlie Childers to Offer False Testimony at Trial

257.    Defendants Battle and Stewart continued to pressure and coerce Angela Bruce up to and through the time of trial. They made explicit their threat to see that Angela's children were removed from her home and cause other hardships for her, including the institution of criminal charges, if she did not testify falsely at trial.

258.    As a direct and proximate result of Defendants' threats and coercion, Angela did provide false testimony at trial, repeating the story that had been fed to her by Defendants Battle and Stewart.

259.    Angela provided critical testimony linking Lee to the fictional "Free Birds gang" which followed a "Code" calling for the execution of any member who tried to quit the gang or spoke with police. Indeed, on appeal, the Georgia

Supreme Court held that Angela's testimony was the only admissible evidence linking Lee to an alleged gang which, of course, was an essential element of Defendants' "gang-related revenge-killing" story.[26]

260.    Charlie Childers was called as a witness against Lee at trial. A sign-language interpreter was brought in to allow Charlie to communicate with the jury.

261.    However, it soon became apparent that no effective communication with Charlie could be had as Charlie was far from proficient with ASL signs. The interpreter grew flustered as there was crosstalk among the lawyers and the judge while she had to resort to the slow and rudimentary process of finger-spelling words one letter at a time.

262.    More troubling, Charlie seemed to be confusing names and events. The trial transcript shows that Charlie did not know Lee, and that Charlie thought

---

[26]    The Georgia Supreme Court held that the trial court erred in allowing two housekeepers who cleaned the Storey home to testify about "gang-related paraphernalia" that they had supposedly seen laying on a counter in the house. It is believed that this composition book belonged to Joseph Wilkins. The book itself was never offered into evidence. The Court likewise held that it was error to allow one of Brian's family members to testify that Brian had supposedly made a comment about being a "free bird." The appellate rulings meant that Angela's testimony was the only "evidence" of any link between Lee and any gang or group, however such may have been defined. *Clark v. State*, 515 S.E.2d 155, 160 (Ga. 1999) (erroneous admission of hearsay related to alleged "gang" membership and "gang rules" in composition book "made harmless by the testimony of the party hostess concerning gang membership and rules").

he was being asked about *another* shooting – one he witnessed some twenty years earlier.

263.    The fact that Charlie referred to the earlier shooting – the 1976 shooting of Randy Quarles – was not clear until those facts were brought to light by the *Proof* podcast and a re-investigation of the case by the Georgia Innocence Project ("GIP").

264.    While it is not yet known whether Defendants Battle and Stewart were aware that Charlie had been thinking of this other shooting when asked questions by them on May 26, 1997, and while on the stand at trial, the following facts are certain: (i) Battle and Stewart both knew Charlie as he was a fixture in the Silver Creek community, and thus also knew that Charlie had extreme communication difficulties; (ii) Battle and Stewart were aware that Charlie could offer no accurate facts or observations regarding Brian's shooting; and (iii) Battle and Stewart saw Charlie as a useful tool in spinning their tale of a gang-related revenge killing.

265.    Defendants Battle and Stewart knew that Charlie's trial testimony would very likely be unintelligible. That fact did not matter, however, because these Defendants planned to have the story that they attributed to Charlie introduced as evidence by two other means.

266.    First, Defendants knew that the supposed witness identification documents that they prepared for Charlie and would attribute to him would almost certainly be admitted as substantive evidence. The documents were, in fact, admitted and published to the jury. Thus, it did not really matter if the jury could make sense of Charlie's "testimony." They had the falsified hard documents purporting to indicate that Charlie had seen Lee outside the Bowling residence on the night Brian was shot.

267.    Next, Defendants knew that Battle would almost certainly testify regarding the investigatory steps he and Stewart had taken, including their purported interview of Charlie. Given the communication issues they knew would result with Charlie on the stand, they reasonably anticipated that Battle would be provided even more leeway than usual to tell the jury about their investigation and their visit to see Charlie. At trial, Defendants were prepared for these potentialities and took full advantage.[27]

268.    Though it is unknown how or whether the jury credited Charlie's truncated testimony from the witness stand, it is plain that the jury took from the

---

[27]    Plaintiff wishes to make clear that he is not asserting any legal claim based upon false testimony offered by Defendant Battle. Plaintiff is aware that such a claim would not be cognizable. The allegations of misconduct and the legal claims derived therefrom instead are premised upon Defendants' actions in fabricating evidence, concealing exculpatory evidence, and initiating and pursuing criminal charges in bad faith and without probable cause.

testimony of Battle and Charlie precisely what Defendants Battle and Stewart intended when they sought out Charlie on May 26, 1997, with the intent of fabricating inculpatory evidence: as reflected in the witness ID documents admitted as trial exhibits, Lee was seen outside the Bowling home immediately after the time at which Brian was shot.

269.    The stories attributed to Angela and Charlie comprised the entirety of the evidence at trial against Lee. Both accounts were fabricated by Defendants Battle and Stewart. Combined with the steady stream of rumor and innuendo which Defendants unleashed in the community and the media, Defendants hoped and intended that a jury would wrongfully convict Lee of murder.

## Lee is Convicted and Sentenced to Life in Prison

270.    The case went to the jury at approximately 1:00 pm on January 18, 1998. A jury poll at 10:00 pm, after nine hours of deliberations, found the jury split 9 – 3. The next day, on January 19, 1998, the jury reached its verdict, finding both Lee and Cain guilty of both murder and conspiracy to commit murder.

271.    It was never decided which of the two boys – Lee or Cain – supposedly shot Brian. That detail never mattered to Defendants. They knew that Lee was nowhere near the Bowling residence at the time of the shooting and that if Cain did shoot Brian, it was accidental. Defendants' invented narrative of a

conspiracy meant that the jury also need not bother itself with determining who fired the fatal shot.

272.   Immediately following the verdict, Lee was sentenced to life in prison. Cain received the same sentence.

273.   A final article about the trial ran in the January 20, 1998, edition of the *Rome News-Tribune*. The article, titled "Jury Convicts Teens of Murder," quoted Lee's attorney Rex Abernathy as follows:

> This conviction will never stand. I don't think there was sufficient evidence to convict Daryl Clark. If there is evidence to sustain a conviction on this, then every person's child throughout this country should be afraid.

274.   The case presented to the jury, as evidenced by the length of deliberations and the 9 – 3 split, was a close one. If defense counsel had been provided the exculpatory and impeachment evidence to which they were entitled under *Brady*, Lee would have been acquitted. Absent the fabrication of evidence by Defendants, there would not have been a criminal case against Lee.

275.   Abernathy was correct in proclaiming that "[t]his conviction will never stand." Unfortunately, because Defendants continued to conceal both evidence and the true facts regarding the case, it would take almost a quarter century for the truth to emerge and for the conviction to be set aside.

### III.    EFFORTS TO PROVE LEE CLARK'S INNOCENCE.

### <u>Lee's Appeal and Post-Conviction Efforts are Rejected</u>

276.    On April 12, 1999, the Georgia Supreme Court affirmed Lee's conviction. *Clark v. State,* 515 S.E.2d 155 (Ga. 1999). Though Lee was denied a new trial, the opinion provides more evidence of just how close a call the case was and the critical importance of the fabricated and concealed evidence.

277.    The Court agreed with the argument that Brian's supposed statement to a family member about being in a "gang" was inadmissible hearsay and should not have been received. *Id.* at 160 ("[E]rroneous admission of the hearsay amounted to harmless error since establishing Brian's membership in the gang with appellants was admitted through the testimony of the party hostess [Angela Bruce].") Thus, the Court made clear the importance of Angela's testimony on that point. Without her false testimony, there would have been no evidence that Brian was in a "gang," however that might have been defined.

278.    The Court again relied on Angela's testimony in holding that the housekeepers should not have been allowed to testify about the composition book they saw (in plain sight, on a counter in the Storey house) and which they thought contained various "rules." *Id.* ("The erroneous admission of the women's testimony concerning the contents of the composition book is, however, made harmless by the testimony of the party hostess [Angela Bruce] concerning gang

membership and rules.") Again, the critical importance of Angela's testimony was laid bare in the opinion affirming Lee's conviction. Absent Angela's false testimony, there would have been no "evidence" of the supposed Free Birds "Code" that called for the execution of any member who either sought to leave the group or spoke to the police.

279.    Upon information and belief, Defendants received a copy of the Georgia Supreme Court's opinion and thus were aware of the emphasis placed on Angela's testimony in affirming Lee's conviction and sentence of life imprisonment. Defendants Battle and Stewart, cognizant that the false testimony they coerced from Angela was the sole evidence underpinning the Court's affirmance, chose to remain silent and continued to conceal their misconduct in procuring Lee's false arrest and wrongful conviction.

280.    All other post-conviction efforts by or on behalf of Lee, including a motion for a new trial, were likewise rejected. Throughout this time, Defendants continued to conceal the true facts surrounding Brian's death and their investigation and took no action to allow a fair hearing on Lee's truthful claims of innocence. Their acts and omissions caused the period of Lee's wrongful conviction to be needlessly extended.

281.    Throughout Lee's 25-year wrongful incarceration, Defendant Floyd County, both independently and by and through the Chief of Police of the Floyd

County Police Department, had the authority and obligation to re-investigate any criminal cases in which Floyd County and FCPD officials and personnel had played an instrumental role. Defendant Floyd County never took any action, either independently or in response to Lee's continued efforts to proclaim his innocence and secure his rightful release, to determine whether the misconduct of Floyd County officials, officers, and employees caused Lee's wrongful conviction.

282.    Lee's efforts to secure release based upon parole were also denied. Parole was denied in January 2012, in 2017, and again in 2020. Lee languished in prison while continuing to truthfully proclaim his innocence. Upon information and belief, Floyd County and the leadership of the FCPD were aware of Lee's post-conviction and parole efforts and either actively opposed those efforts or otherwise took no action to allow a fair hearing of Lee's innocence claims and his pleas for release.

283.    At no point did Floyd County or any of the other Defendants take any action to provide Lee or those acting on his behalf the evidence that was unlawfully concealed from Lee pre-trial. Nor did Floyd County and the other Defendants ever take any action to remediate the harms caused by their misconduct.

### Lee's Pleas of Innocence Prompt a Re-Investigation of his Case and the Death of Brian Bowling

284.    While in prison, Lee met and befriended another individual who had been wrongfully convicted, Joey Watkins ("Watkins"). Though they had not known each before that chance meeting behind bars, both Lee and Watkins were from Floyd County, and both believed (and would later prove) that their wrongful convictions resulted from misconduct on the part of Floyd County and FCPD investigators.

285.    Watkins had been convicted in 2001 in connection with a shooting death that had occurred the year prior. Watkins's case had been investigated by FCPD investigators after the Rome Police Department had looked into supposed rumors of Watkins's responsibility for the subject shooting but had cleared him as a suspect.[28]

286.    In 2016, podcaster Susan Simpson ("Simpson") investigated Watkins's innocence claim. Watkins's case was featured in a podcast, *Undisclosed*. During work on the podcast, Watkins mentioned Lee's case to Simpson who then resolved to investigate the Brian Bowling shooting and Lee's innocence claim.

---

[28]    Watkins was exonerated in 2023 after a team at GIP successfully challenged the validity of his conviction.

287.    Simpson and her team featured Lee's case in the *Proof* podcast which aired in 2022. At the same time, GIP pressed ahead with its independent investigation of the case.

288.    The re-investigation of the case revealed the following critical evidence:

(a) Angela Bruce was coerced into implicating Lee and Cain in Brian's death and providing false testimony against them due to threats by Defendants Battle and Stewart to have her children removed from her home if she did not do so.

(b) Defendants Battle and Stewart made multiple late-night visits to Angela's home pursuant to their efforts to coerce incriminatory statements from her. No records of these visits or conversations were provided to the DA or Lee's counsel. In addition to the threats, Battle made romantic and sexual overtures towards Angela.

(c) During the investigation into Brian's death, Battle was engaged in an undisclosed affair with Brian's aunt.

(d) Defendant Burnes flagrantly misrepresented his expertise and training, falsely testifying at trial and telling others that he'd earned a master's degree related to forensic pathology. In truth, Burnes had, at most, attended a brief seminar course on medicolegal death investigations.

(e) Defendant Burnes falsely represented to the Bowling family that Brian's body had been autopsied. There was no autopsy done. Burnes improperly billed and collected from the family $7,000 for an autopsy even though no autopsy was done, and no charge would be due even if one had been performed.

(f) FCPD investigators interviewed numerous people who attended the party at Angela's home and produced no records of those interviews

because none would corroborate the story that Defendants pressured Angela to tell.

(g) FCPD investigators interviewed numerous people who contradicted the narrative about a Free Birds gang and produced no records of those interviews because none would corroborate the story about a gang such as that invented by Defendants.

(h) Charlie Childers never told Battle and Stewart that he had seen Lee outside the Bowling home on the night Brian was shot. Charlie had witnessed another shooting some twenty years earlier and it was that shooting that he thought he was being asked about at trial.

289.    The evidence that was long hidden by Defendants and finally unearthed through the painstaking efforts of Simpson and her team, as well as GIP, was compelling. The work persuaded both Brian's family and the DA's Office that Lee was innocent and never should have been the subject of a criminal prosecution in connection with Brian's death.

## IV.    LEE CLARK IS EXONERATED.

290.    On September 16, 2022, GIP filed both an Extraordinary Motion for New Trial ("EMNT") and an Application for Writ of Habeas Corpus ("Habeas Petition") on Lee's behalf. The EMNT was filed in the Superior Court of Floyd County (the venue of the trial), and the Habeas Petition was filed in the Superior Court of Coffee County (the county in which Lee was incarcerated at the time).

291.    The GIP filings highlighted the evidence uncovered that demonstrated the falsity of the accounts and trial testimony attributed to Angela Bruce and Charlie Childers.

292.    On November 7, 2022, Cain, through counsel, also separately filed an EMNT.

293.    The State consented to both EMNTs and also agreed to file a Motion to Enter Nolle Prosequi with respect to Lee.

294.    On December 8, 2022, the Honorable John E. Niedrach of the Floyd County Superior Court, Rome Judicial District granted the Consent Order Granting Defendants' Extraordinary Motions for New Trial ("Consent Order").

295.    The Consent Order vacated the Sentence and Judgment that had been entered on January 27, 1998, and provided for the immediate release of both Lee and Cain. On that same day, Judge Niedrach also granted the State's Motion to Enter Nolle Prosequi with respect to Lee.

296.    On December 8, 2022, Lee finally walked out of prison after spending more than 25 years in custody as an innocent man.

## CAUSES OF ACTION

### FEDERAL CONSTITUTIONAL CLAIMS

### COUNT I:  42 U.S.C. § 1983 Claim for Fourteenth Amendment Due Process Violations – Fabrication of False Inculpatory Evidence

(Against Defendants Battle, Stewart, and Wallace
in their Individual Capacities)

297.    Plaintiff hereby incorporates all the foregoing paragraphs as if fully restated herein and further alleges as follows:

298.    In the manner fully described above, Defendants Battle, Stewart, and Wallace, while acting in concert and aiding and abetting one another, deprived Plaintiff of his constitutional right to a fair trial and fair legal process by deliberately and/or recklessly causing the fabrication of false inculpatory evidence.

299.    These Defendants acted jointly in agreement to deprive Plaintiff of his constitutional rights. Each Defendant engaged in overt acts in furtherance of that agreement and in furtherance of their intent to deprive Plaintiff of his constitutional rights by manufacturing false evidence, making false representations to the DA's Office, and by failing to intervene to prevent others' misconduct.

300.    Defendants Battle, Stewart, and Wallace deprived Plaintiff of his liberty without due process of law and of his right to a fair criminal proceeding by deliberately and/or recklessly fabricating evidence that was used to wrongfully arrest, prosecute, convict, and imprison him for more than 25 years. These Defendants did so willfully and maliciously with full knowledge that no evidence whatsoever connected Plaintiff to the tragic death of Brian Bowling.

301.    These Defendants unlawfully fabricated evidence used to arrest, charge, prosecute, and wrongfully convict Plaintiff in the following respects:

(a) Defendants Battle and Wallace coerced a false admission of culpability for the shooting death of Brian from Cain Storey and thereby fabricated evidence that the shooting was not self-inflicted. The statement attributed to Cain in which he was pressured to say that the gun was in his hand at the time it was discharged was a key piece of the conspiracy case manufactured by Defendants and was presented to the jury.

(b) Defendants Battle and Stewart coerced a false statement from Angela Bruce in which she falsely claimed that Lee and Cain boasted about a gang-related, "execution style," revenge killing of Brian. This fabricated witness account, invented and coerced by Defendants, served as the basis for the institution of murder and conspiracy charges against Lee and Cain and was also critical evidence, albeit false, that was presented to the jury.

(c) Defendants Battle and Stewart created false evidence in the form of witness identification documents attributed to Angela which were used in the prosecution of Lee to further the fabricated story that Lee attended a party at Angela's home and boasted about the murder of Brian.

(d) Defendants Battle and Stewart created both a false account to be attributed to Charlie Childers about seeing Lee outside the Bowling home on the night that Brian was shot, as well as fabricated witness identification documents. Defendants caused both the documents and the fabricated story to be used in the prosecution of Lee and to be presented to the jury.

(e) Defendant Battle fabricated evidence by adding the "no narcs" message to the Joseph Wilkins's drawing removed from Brian's casket on or about November 21, 1998. Upon information and belief, he did so with the knowledge and assent of Defendants Stewart and Wallace and this false evidence was used at trial and throughout the criminal prosecution of Lee to bolster the fabricated narrative of a violent gang with a "Code" calling for the execution of any member who spoke to the police.

(f) Defendants Battle and Stewart, with the knowledge and assent of Defendant Wallace, created and published, both to the public and to the DA's Office and the court, the false and fabricated evidence that Lee and Cain either fled (in the case of Cain) and were about to flee (Lee) the State of Georgia with knowledge that said false information would affect

public perception and would cause Lee to be held without bail pending trial.

(g) Defendants Battle and Stewart, with the knowledge and assent of Defendant Wallace, actively enticed and recruited jailhouse informants to make statements incriminating Lee in the shooting death of Brian, even though they knew the statements were false. Upon information and belief, these fabricated statements comprised part of the case presented to the grand jury and thus contributed to the institution of criminal charges against Lee.

(h) In other respects to be proved through discovery and at trial.

302.    Plaintiff's prosecution was premised upon the above-referenced false inculpatory evidence that had been fabricated by Defendants. That fabricated evidence directly led to Plaintiff's arrest, his indictment, his conviction, and his wrongful imprisonment for more than 25 years.

303.    Any reasonable law enforcement officer in 1996, 1997, and 1998 would have known – and these Defendants did know – that the fabrication of evidence as alleged herein was unlawful.

304.    The misconduct described herein was objectively unreasonable and was undertaken willfully, intentionally, and/or in reckless disregard for Plaintiff's clearly established constitutional rights.

305.    Absent the fabrication of evidence by Defendants, the arrest and prosecution of Plaintiff could not and would not have been pursued, and Plaintiff would not have been convicted.

306.    All of the foregoing acts were committed under color of state law and violated clearly established law of which any reasonable law enforcement officer would have known.

307.    Defendants' fabrication of false inculpatory evidence directly and proximately caused Plaintiff's wrongful arrest, conviction, and deprivation of liberty without due process of law for over 25 years, as well as the physical, emotional, psychological, and pecuniary injuries described in this Complaint and to be proved through discovery and at trial.

### COUNT II: 42 U.S.C. § 1983 Claim for Fourteenth Amendment Violations – Concealment of Exculpatory and Impeachment Evidence

(Against Defendants Battle, Stewart, and Wallace
in their Individual Capacities)

308.    Plaintiff hereby incorporates all the foregoing paragraphs as if fully restated herein and further alleges as follows:

309.    Defendants Battle, Stewart, and Wallace deliberately, intentionally, and/or recklessly failed to disclose exculpatory and impeachment evidence to the DA's Office as required by *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny.

310.    These Defendants deprived Plaintiff of his clearly established constitutional right to due process of law and fair criminal proceedings by deliberately, intentionally, and/or recklessly failing to disclose exculpatory and

impeachment evidence to the District Attorney, including but not limited to the

following:

(a) Defendants concealed numerous witness interviews and notes and reports related to same which contradicted and undercut the story told by Angela Bruce at Defendants' urging and because of their coercion of her. Defendants concealed all evidence they obtained which would prove the falsity of the story they had fed to Angela.

(b) Defendants concealed their notes and reports related to the numerous occasions on which Defendants Battle and Stewart met with Angela Bruce pursuant to their efforts to obtain some inculpatory statement from her. The notes and other materials related to these other meetings would have demonstrated that Angela originally (and truthfully) denied any knowledge about Lee, any supposed "Free Birds gang," or Brian's death.

(c) Defendants concealed numerous witness interviews and notes and reports related to same which contradicted and undercut Defendants' narrative regarding the existence of a gang called the Free Birds.

(d) Defendants concealed the notes and reports related to same regarding the veracity of Lee's alibi claim for the evening of October 18, 1996. Upon information and belief, these Defendants obtained corroboration that Lee, in fact, was miles away from the Bowling home and at his apartment in Lindale at the time Brian was shot.

(e) Defendants concealed the fact that Defendant Battle was engaged in an extramarital affair with Brian Bowling's aunt during the course of the FCPD's investigation into the circumstances of his death and that, as a result, Battle had an incentive to pursue criminal charges against Lee despite the lack of any evidence to support such charges.

(f) Defendants concealed their notes, writings, and reports from interviews conducted on the night of October 18, 1996, including but not limited to those of Cain Storey and Caprice Hiott, which corroborated Cain's account that the gun was in Brian's hand at the time the fatal shot was fired.

(g) In other respects to be proved through discovery and at trial.

311. Defendants' failure to document and disclose exculpatory and impeachment evidence to the DA's Office was intentional, reckless, and/or deliberate and done in bad faith. Defendants were aware of the material exculpatory and impeachment value of the concealed information and evidence, as well as their obligation under *Brady* to disclose same and intentionally and/or recklessly and in bad faith failed to do so.

312. Any reasonable law enforcement officer in 1996, 1997, and 1998 would have known, and these Defendants did know, that the exculpatory and impeachment evidence described in this Complaint had to be documented and disclosed to the DA's Office. No reasonable officer would have believed that the misconduct described herein was lawful.

313. Defendants' intentional, deliberate, and/or reckless and bad faith failure to disclose exculpatory and impeachment evidence as described in this Complaint deprived Plaintiff of his right to a fair criminal process and his constitutional right to due process under the Fourteenth Amendment.

314. Defendants' wrongful concealment of exculpatory and impeachment evidence directly and proximately caused Plaintiff's wrongful conviction and deprivation of liberty without due process of law during his 25-year wrongful

incarceration, as well as the other injuries and damages set forth in this Complaint and to be proved through discovery and at trial.

### COUNT III: 42 U.S.C. § 1983 Claim for Fourth Amendment Violation – Malicious Prosecution

(Against Defendants Battle, Stewart, and Wallace
in their Individual Capacities)

315.    Plaintiff hereby incorporates all the foregoing paragraphs as if fully set forth herein and further alleges as follows:

316.    As described more fully above, Defendants Battle and Stewart instituted a criminal proceeding against Plaintiff with charges of murder and conspiracy to commit murder despite his actual innocence and these Defendants' knowledge that no probable cause supported the institution of criminal charges against Plaintiff. Upon information and belief, Defendant Wallace either directly participated in or alternatively assented to and condoned the misconduct alleged in this Count.

317.    These Defendants, acting individually and in concert with each other, under color of state law and within the scope of their employment with Floyd County and the FCPD, caused, instituted, and participated in the initiation of a criminal proceeding against Plaintiff despite the absence of probable cause. Thereafter, these Defendants caused that criminal proceeding to be continued against Plaintiff up to and through the time of trial.

318.    Defendants caused Plaintiff to be arrested and seized pursuant to an arrest warrant that was not supported by probable cause. Thereafter, Defendants concealed and withheld information from the DA's Office and supplied fabricated evidence to the DA's Office that directly resulted in Plaintiff being indicted on charges of murder and conspiracy to commit murder.

319.    The criminal proceedings described herein (e.g., Plaintiff's arrest, indictment, seizure, and trial) were instituted and continued by Defendants Battle and Stewart with malice. Upon information and belief, Defendant Wallace either directly participated in or alternatively assented to and condoned this misconduct. The wrongful actions of these Defendants caused incomplete, misleading, and fabricated evidence and information to be provided to the DA's Office with knowledge that their actions would result in criminal proceedings being pursued against Plaintiff.

320.    Any preclusive effect that would ordinarily apply to a finding of probable cause by a magistrate and a grand jury is nullified by Defendants' deliberate and bad faith actions that led to fabricated, false, incomplete, and misleading evidence being used to secure Plaintiff's arrest, seizure, and indictment.

321.    Plaintiff was seized on May 23, 1997, as a result of the initiation of the criminal proceedings, and he remained incarcerated pursuant to the wrongful

criminal charges described herein up to and including December 8, 2022, when the proceedings terminated in Plaintiff's favor with his exoneration.

322.    As a direct and foreseeable consequence of the misconduct described herein on the part of these Defendants, Plaintiff was unreasonably and unlawfully subjected to criminal prosecution and more than 25 years of wrongful incarceration.

323.    Defendants' malicious prosecution of him caused his arrest, seizure, prosecution, and wrongful imprisonment for 25 years. As a direct and foreseeable consequence of Defendants' misconduct described in this Count, Plaintiff suffered physical, emotional, psychological, and pecuniary injuries described in this Complaint and to be proved through discovery and at trial.

### COUNT IV: 42 U.S.C. § 1983 Claim for Fourteenth Amendment Violations – Civil Conspiracy

(Against Defendants Battle, Stewart, Wallace, and Burnes
in their Individual Capacities)

324.    Plaintiff hereby incorporates all the foregoing paragraphs as if fully restated herein and further alleges as follows:

325.    During the investigation of Brian Bowling's death, Defendants Battle, Stewart, Wallace, and Burnes knowingly conspired, reached a mutual understanding, and acted in concert to violate Plaintiff's constitutional rights, including his Fourteenth Amendment rights to a fair trial and due process of law.

99

These Defendants reached an agreement amongst themselves to conceal evidence indicating that the subject fatal gunshot was self-inflicted and/or accidental, and to conceal evidence which would have demonstrated that Plaintiff had nothing to do with Brian's death.

326.    Defendants Battle and Stewart further knowingly conspired, reached a mutual understanding, and acted in concert to wrongfully implicate Plaintiff in an alleged murder conspiracy despite knowledge of Plaintiff's actual innocence and in violation of Plaintiff's constitutional rights. Upon information and belief, Defendant Wallace either directly participated in or alternatively assented to and condoned the misconduct alleged in this Count.

327.    In furtherance of the conspiracy to conceal evidence relating to the circumstances and true facts surrounding the gunshot that resulted in Brian Bowling's death, Defendants Battle, Stewart, Wallace, and Burnes undertook the following overt acts:

(a) Defendants Battle and Burnes met on October 20, 1996, to view Brian Bowling's body. Defendant Wallace either also attended this meeting or learned of the details soon thereafter.[29] All knew that Brian had suffered

---

[29]    Plaintiff is aware that Wallace's exclamation at p. 16 of the transcript of Cain Storey's October 20, 1996, interrogation that "the wound was closer" seems to conflict with the account that Defendants would later posit, that being a shot fired from a distance of at least "12 to 18 inches." It is not yet known whether Wallace simply had a slip of the tongue when he seemed to acknowledge that the gun was very close to Brian's head when it discharged or whether there is some other explanation. The salient facts are that Wallace possessed critical, undisclosed knowledge about the wound at an early date and

a contact gunshot wound, as evidenced by powder burns on his right temple. Despite that knowledge, these Defendants agreed to and set about to conceal all evidence of a contact wound.

(b) Defendant Burnes falsely led the Bowling family to believe that an autopsy was performed on Brian's body. He falsely represented that the body had been sent to the GBI Crime Lab for autopsy, when Burnes knew that was not so. The FCPD Defendants were aware of this fabrication and assented to and condoned it toward the end that the narrative of a "distance" shot could be advanced.

(c) Defendant Burnes and the FCPD Defendants consciously and deliberately chose not to have an autopsy done and not to have a medical examiner consulted because they knew that taking either of those steps would have shown that Brian suffered a close-range or contact gunshot wound that was self-inflicted. Defendants collectively decided not to avail themselves of routine investigatory steps that any reasonable investigator and any reasonable coroner would have pursued.

(d) For the same reason as referenced above, these Defendants decided not to have a GSR test conducted on Brian's hands at any point in time. Defendants consciously chose to avoid any test or analysis that would have cast doubt on or disproved the story of a "distance" shot.

(e) In other respects to be proved through discovery and at trial.

328.   In furtherance of the conspiracy to wrongfully implicate Plaintiff in an alleged murder plot despite the absence of any evidence of Plaintiff's culpability in Brian Bowling's death, Defendants Battle, Stewart, and Wallace undertook the following overt acts:

(a) Defendants Battle and Stewart coerced Angela Bruce to falsely implicate Plaintiff in Brian Bowling's death despite their knowledge that Plaintiff bore no culpability whatsoever for the subject tragic shooting and that

_____

that thereafter, during the investigation and through trial, FCPD investigators and Burnes pushed a narrative involving a "distance" shot.

Angela had never seen Plaintiff, much less heard him say anything about Bowling's shooting or death. Defendant Wallace either participated in these efforts or alternatively assented to and condoned them.

(b) Defendants Battle and Stewart, with either the participation or assent and condonation of Defendant Wallace, fabricated a witness statement and witness identification documents to attribute to Charlie Childers despite their knowledge that Plaintiff bore no culpability whatsoever for Brian's death and that Charlie never indicated that he had seen Plaintiff at the Bowling home on the night of the shooting.

(c) These Defendants deliberately chose not to take any reasonable investigatory steps (i.e., GSR test of Brian's hands, autopsy, and/or consultation with a medical examiner) that would have established that Brian suffered a self-inflicted contact gunshot wound. Defendants further coordinated their efforts with Defendant Burnes so as to ensure that Burnes did not take or request these reasonable investigatory steps.

(d) These Defendants concealed all witness statements that contradicted their narratives about a gang, a gang "Code," and the relationship between the safe theft and Brian's death.

(e) These Defendants deliberately propagated false stories and rumors in the community about a gang-related, execution-style murder and provided those same false accounts to local media.

(f) These Defendants pressured, coerced, and enticed jailhouse informants into making false statements implicating Plaintiff and/or Cain in Brian's death with actual knowledge that the statements they solicited were false.

(g) These Defendants concocted a story to falsely implicate Brian's 15-year-old girlfriend, Caprice, in a supposed murder conspiracy so as to ensure that her truthful testimony would be disregarded and pursuant to their hope that they could pressure her to either not testify or to say something incriminatory as to Lee and/or Cain to avoid any risk that she herself might face a murder charge.

(h) In other respects to be proved through discovery and at trial.

102

329.     Following Plaintiff's conviction, Defendants Battle, Stewart, Wallace, and Burnes conspired, and continued to conspire, to deprive Plaintiff of exculpatory information and materials of which they were aware, and which would have aided Plaintiff in proving his innocence and securing his exoneration at an earlier date.

330.     The conspiracies engaged in by these Defendants directly and proximately deprived Plaintiff of his rights under the Fourteenth Amendment and caused his unfair trial, wrongful conviction, and more than 25 years of wrongful incarceration. As a direct and foreseeable consequence of Defendants' acts, Plaintiff suffered physical, emotional, psychological, and pecuniary injuries as described in this Complaint and to be proved through discovery and at trial.

## COUNT V: 42 U.S.C. § 1983 Claim for Fourth Amendment Violation – Unreasonable Seizure

(Against Defendant Burnes in his Individual Capacity)

331.     Plaintiff hereby incorporates all the foregoing paragraphs as if fully restated herein and further alleges as follows:

332.     At all times relevant to this action, Plaintiff had the right under the Fourth Amendment to not be prosecuted without probable cause. This included the right to not be prosecuted without probable cause based on false statements and reports by state actors.

333.    Defendant Craig Burnes was acting under color of law and in his capacity of Coroner of Floyd County when he took possession of Brian's body on or about October 19, 1996. Burnes had those duties and responsibilities as are imposed by law on an official fulfilling the role of county coroner.

334.    Pursuant to Georgia law, Burnes was required to properly care for Brian's body and to undertake any necessary and reasonable inquiry to determine the cause of death since it was obviously occasioned by other than natural causes.

335.    Despite the legal obligation to see that the cause of Brian's death was properly determined, Defendant Burnes shirked his responsibilities and took no action to ascertain the cause of Brian's death.

336.    Defendant Burnes performed his duties either intentionally in bad faith or recklessly so as to create a false report that the gunshot that killed Brian was fired from a "distance" and was not a "contact" or "close" shot. At trial, Burnes elaborated and testified falsely that, based upon his supposed findings, the gun must have been at least "12 to 18 inches" from Brian's head when fired. No evidence supported this false report, and Burnes knew it.

337.    Defendant Burnes met with FCPD investigators and agreed with them that the false report that Brian was killed by a "distance" shot would become the official coroner's report regarding Brian's death.

338.    Burnes thereafter took deliberate actions to conceal the fact that no investigation had been undertaken and no evidence supported the official coroner's report he knew would be published and used in the pursuit of criminal charges. Specifically, Burnes sought to conceal his intentional, bad faith or reckless actions as follows:

(a) Burnes deliberately chose to not have an autopsy done, or a medical examiner consulted, because a trained professional would be able to quickly and conclusively determine that the gunshot that killed Brian was self-inflicted and caused a contact wound.

(b) Burnes falsely told the Bowling family that an autopsy had been performed in an effort to prevent any further inquiry into the cause of Brian's death and to hide the fact of his intentional and bad faith, or reckless, investigation of Brian's injuries.

(c) Burnes misrepresented his expertise and experience to conceal his intentional and bad faith, or reckless, handling of Brian's body and review of his injuries.

(d) Burnes either destroyed or intentionally failed to make any notes or records related to his review of Brian's injuries in an effort to frustrate or preclude any analysis of his supposed findings.

(e) Burnes repeatedly made false statements and fabricated evidence regarding a purported "packing material" to explain away the powder burns visible on Brian's right temple.

(f) Burnes intentionally and in bad faith chose to conform his official coroner findings and subsequent trial testimony to fit the murder conspiracy narrative concocted by FCPD investigators.

339.    At all relevant times, Defendant Burnes knew that his official coroner findings would be, in part, relied upon by FCPD investigators to justify pursuit of

criminal charges. Burnes knew or should have known that his purported findings were unsupported by any objective or scientific evidence. Burnes intentionally and in bad faith, or recklessly, concealed the falsity of his supposed findings with knowledge that unsupported criminal charges would be instituted, in part, based upon those supposed findings.

340.    Defendant Burnes continued to conceal his bad faith and/or reckless misconduct throughout the wrongful prosecution of Plaintiff. Burnes provided false testimony at trial as part of a continuing effort to conceal his misconduct.

341.    Defendant Burnes's misconduct as alleged in this Count contributed to the wrongful institution of criminal charges against Plaintiff, as well as his seizure, and wrongful conviction.

342.    Defendant Burnes violated Plaintiff's right to be free of a wrongful seizure guaranteed under the Fourth Amendment and, thus, should share in liability for the damages and injuries suffered by Plaintiff, including his wrongful prosecution and 25-year wrongful incarceration.

### COUNT VI: 42 U.S.C. § 1983 Municipal Liability Claim for Deprivation of Constitutional Rights Under *Monell v. Dep't of Social Servs. of the City of New York*, 436 U.S. 658 (1978)

(Against Defendant Floyd County – FCPD Deficiencies)

343.    Plaintiff hereby incorporates all the foregoing paragraphs as if fully restated herein and further alleges as follows:

344.   The Floyd County Police Department was at all times relevant to this Complaint an entity controlled and funded by Floyd County, Georgia.

345.   Upon information and belief, the Chief of Police of the FCPD was at all times relevant to this Complaint selected by officials of Floyd County. Upon information and belief, Defendant Floyd County delegated the rules, procedures and training that applied to officers employed by the FCPD.

346.   The Chief of Police of the FCPD, and/or his designee, during the relevant time period was a final policymaker for Floyd County with regard to all investigative, policing, and training activities of the FCPD. The acts and omissions of the FCPD Chief of Police and/or his designee, during the time relevant to this Complaint, constituted the policy, custom, or pattern and practice of Floyd County.

347.   Defendant Floyd County, by and through its final policymaker(s), with deliberate indifference, created, promulgated, and maintained the following policies, customs, or patterns which deprived Plaintiff of his constitutional rights, including but not limited to his rights not to be arrested or seized without probable cause, not to be deprived of his liberty without due process of law, to a fair criminal proceeding, and to meaningful access to the courts as follows:

(a) Failing to properly train, supervise and/or discipline FCPD investigators with regard to their constitutional duties not to (i) fabricate evidence; (ii) coerce false statements; (iii) conceal exculpatory evidence; (iv) destroy exculpatory evidence; (v) intentionally or recklessly fail to conduct an

investigation to determine the true facts; and (vi) ignore evidence that points to the innocence of a suspect.

(b) Encouraging, promoting, ratifying, and condoning FCPD investigators to (i) fabricate evidence; (ii) coerce false statements; (iii) conceal exculpatory evidence; (iv) destroy exculpatory evidence; (v) intentionally or recklessly fail to conduct an investigation to determine the true facts; and (vi) ignore evidence that points to the innocence of a suspect.

(c) Creating, promulgating, ratifying, and condoning policies, practices, and customs which allowed and encouraged FCPD investigators to solicit false witness statements and testimony by threats, coercion, and improper entreaties to individuals known to be susceptible to enticements and/or threats to make false inculpatory statements, including but not limited to inmates at the Floyd County Jail and those easily influenced and/or susceptible to threats of criminal liability.

(d) Creating, promulgating, ratifying, and condoning policies, practices, and customs which encouraged FCPD investigators to not memorialize witness statements and interviews such that the FCPD investigative file provided to the DA's Office was effectively "sanitized" in such a way that it contained only materials supporting FCPD investigators' desired narrative for a particular investigation.

(e) In other respects to be proved through discovery and at trial.

348.    The wrongful acts and omissions that caused Plaintiff's wrongful arrest, prosecution, conviction and incarceration were carried out pursuant to Defendant Floyd County's constitutionally inadequate policies, customs, patterns or practices.

349.    These governmental policies, customs or patterns and practices of Floyd County proximately and directly caused Plaintiff's wrongful arrest, prosecution, conviction, and incarceration.

350.    Defendant Floyd County condoned and ratified the policies, customs, or patterns and practices of FCPD investigators at issue in this lawsuit, despite having actual knowledge that they routinely violated individuals' rights and took actions that caused wrongful arrests and prosecutions.

351.    As a direct and foreseeable consequence of the deficient municipal policies, customs, or patterns and practices as described above, Plaintiff was wrongfully arrested, prosecuted, convicted, and incarcerated, and suffered physical, emotional, psychological, and pecuniary damages as described in this Complaint and to be proved through discovery and at trial.

### COUNT VII: 42 U.S.C. § 1983 Claim for Municipal Liability for Deprivation of Constitutional Rights Under *Monell v. Dep't of Social Servs. of the City of New York,* 436 U.S. 658 (1978)

(Against Defendant Floyd County – Office of Coroner Deficiencies)

352.    Plaintiff hereby incorporates all the foregoing paragraphs as if fully restated herein and further alleges as follows:

353.    The Floyd County Coroner's Office was at all times relevant to this Complaint an entity controlled and funded by Floyd County, Georgia.

354.    Upon information and belief, Defendant Floyd County delegated the rules, procedures and training that applied to the Coroner's Office to the Coroner. In the alternative, Plaintiff alleges that Coroner Craig Burnes was the official and final policymaker for the Floyd County Coroner's Office.

355.    Either through delegation to Coroner Craig Burnes or because Burnes himself was the final policymaker for the Floyd County Coroner's Office, the acts and omissions of Burnes as Coroner of Floyd County, during the time relevant to this Complaint, constituted the policy, custom, or pattern and practice of Floyd County.

356.    Defendant Floyd County, by and through its final policymaker(s), with deliberate indifference, created, promulgated, and maintained the following policies, customs, or patterns which deprived Plaintiff of his constitutional rights, including but not limited to his rights not to be arrested or seized without probable cause, not to be deprived of his liberty without due process of law, to a fair criminal proceeding, and to meaningful access to the courts as follows:

(a) Failing to properly conduct death investigations when required by law and/or the facts, including but not limited to failing to see that an autopsy be done and/or that a medical examiner be consulted regarding deaths to which criminal liability might attach.

(b) Failing to make, keep, and maintain notes, reports, and writings related to official acts of the Coroner's Office.

(c) Following a practice, policy, or custom of falsely reporting that an autopsy had been performed when no such autopsy had been undertaken.

(d) Following a practice, policy, or custom of conferring privately with FCPD investigators regarding criminal investigations and falsely shaping official coroner findings and opinions to match investigators' preferred narratives regarding deaths under investigation.

(e) Following a practice, policy, or custom of reckless conduct of death investigations with knowledge that resultant opinions and findings to be shared with law enforcement personnel and those in the judicial system had no scientific basis and were likely to result in unwarranted criminal charges being instituted.

(f) Following a practice, policy, or custom of engaging in official acts in a dishonest fashion and with reckless disregard for the rights and safety of others.

(g) In other respects to be proved through discovery and at trial.

357.    These governmental policies, customs or patterns and practices of Floyd County, by and through the Floyd County Coroner, proximately and directly caused and/or contributed to Plaintiff's wrongful arrest, prosecution, conviction, and incarceration.

358.    Defendant Floyd County condoned and ratified the policies, customs, or patterns and practices of the Floyd County Coroner at issue in this lawsuit, despite having actual knowledge that these policies, customs, or patterns and practices would result in the violation of individuals' rights and cause wrongful arrests and prosecutions.

359.    As a direct and foreseeable consequence of the deficient municipal policies, customs, or patterns and practices as described above, Plaintiff was wrongfully arrested, prosecuted, convicted, and incarcerated, and suffered physical, emotional, psychological, and pecuniary damages as described in this Complaint and to be proved through discovery and at trial.

**COUNT VIII: 42 U.S.C. § 1983 Claim for Municipal Liability**
**Based Upon Failure to Train and Supervise FCPD Investigators**

(Against Defendant Floyd County)

360.     Plaintiff hereby incorporates all the foregoing paragraphs as if fully restated herein and further alleges as follows:

361.     Defendant Floyd County failed to train and failed to supervise FCPD personnel and officers both prior to and throughout the wrongful prosecution of Plaintiff. As a direct and proximate result of Defendant Floyd County's failure to properly train and supervise FCPD personnel, including the FCPD investigators involved in Plaintiff's wrongful prosecution, the investigation of the circumstances surrounding Brian Bowling's death was botched and Plaintiff was wrongfully prosecuted, unlawfully seized without probable cause, and wrongfully incarcerated for 25 years.

362.     Defendant Floyd County was aware of widespread and serious issues with the gross deficiencies in training and supervision of FCPD investigators and was also aware of the likelihood that citizens' rights would be violated, and wrongful arrests and prosecutions would result. In spite of this knowledge of the need for training and supervision of FCPD investigators, Defendant Floyd County was deliberately indifferent to the need for training and supervision of FCPD investigators.

363.    Throughout Plaintiff's ordeal, both during his wrongful incarceration and in later years during which neither Defendant Floyd County nor the individual Defendants took any action to address the unlawfulness of Plaintiff's conviction or to even allow a re-investigation of the case which resulted in his conviction, Defendant Floyd County was deliberately indifferent to the need for training and supervision of FCPD investigators.

364.    Upon information and belief, Defendant Floyd County was aware of a widespread pattern of similar constitutional violations by untrained and unsupervised employees of the FCPD and remained deliberately indifferent to the need to train and supervise those employees. Alternatively, the need for training was so obvious and the likelihood that constitutional violations would result due to such lack of training was so great, Defendant Floyd County is subject to municipal liability based upon its deliberate indifference to the glaring need for appropriate training.

365.    Training and supervision of FCPD personnel was grossly deficient and constitutionally inadequate with respect to the following: (i) processing and documenting crime scenes; (ii) memorializing witness interviews and maintaining documentation related to same; (iii) enticing, pressuring, and coercing witnesses to make false statements incriminating others; (iv) identifying, preserving, and producing exculpatory and impeachment evidence as required by law; and (v)

allowing officers prone to abusing their roles as police officers and who engaged

in acts indicative of a lack of integrity, honesty, and morality to remain in the

County's employ.

366.    Defendant Floyd County's deliberate indifference to the need for

proper training and supervision of FCPD investigators is evidenced by the

following:

(a) No contemporaneous notes or records exists related to FCPD
investigators interviews of witnesses on the night of Brian Bowling's
shooting. The lack of recordation of statements directly contributed to
the false charges instituted against Plaintiff. Floyd County and FCPD
officials were aware of the obvious need for training and supervision
regarding notetaking and record-keeping yet failed to provide such for
FCPD investigators.

(b) FCPD investigators routinely sought and solicited unreliable statements
from jailhouse informants with knowledge that such statements were
untrue and would result in false and fabricated evidence being used in
the prosecution of innocent persons. Promises and entreaties and the
lures of illicit benefits were so common that inmates would openly
bargain with investigators for favors and investigators would indulge
those requests in exchange for sought-after statements and testimony.
Floyd County and FCPD officials were aware of the obvious need for
training and supervision regarding the solicitation of unreliable
statements from jailhouse informants yet failed to provide such for FCPD
investigators.

(c) FCPD investigators routinely engaged in sexual and romantic relations
with witnesses and others involved in criminal prosecution processes
such that investigators' motivations were routinely inconsistent with
legitimate investigatory practices. Both Defendants Battle and Stewart
faced discipline by the FCPD for such misconduct, yet both continued
with careers in law enforcement with Battle being rehired by the Polk
County Jail and Stewart being rehired by the Floyd County Jail.
Throughout the time period relevant to this suit, Floyd County and

FCPD officials were aware of the obvious need for training and supervision regarding improper relationships that would compromise FCPD investigators' integrity and judgment yet failed to provide such training and supervision.

(d) Floyd County and FCPD routinely employed officers who were, due to serious character and moral failings, unfit to serve as law enforcement officers. Defendants Battle and Stewart were two such examples, as their personnel files reveal longstanding and pervasive issues involving their judgment, integrity, honesty, and temperament, that rendered them unfit to act as Floyd County law enforcement officers. Complaints and issues involving these officers and others on the FCPD force both post-dated and pre-dated the Bowling investigation and were widely known such that Floyd County and FCPD officials were aware of the obvious need to provide proper training and supervision to FCPD personnel regarding the responsibilities of their office and to remove from employment those unfit to serve.

(e) No proper documentation of the crime scene or collection of evidence was conducted in connection with the underlying investigation. Two sets of photos were taken that were inconsistent with one another, such that confusion ensued, and false narratives were allowed to take root. Critical pieces of evidence were lost, misplaced, or never recovered, e.g., Battle lost the spent casing and live bullet recovered at the crime scene that same night; the bullet that killed Brian Bowling was never recovered from his room; the blue pillow that Battle and Stewart told witnesses was used to muffle the gunshot was "lost" in the trunk of Sergeant Shifflett's car for roughly three months; and FCPD investigators never saw that a GSR test was performed with respect to Brian. FCPD training and supervision regarding crime scene investigation was not undertaken despite the obvious need for such and knowledge that the failure to provide such training and supervision would cause wrongful prosecutions to be instituted and wrongful convictions to occur.

(f) Substantial exculpatory and impeachment evidence subject to disclosure pursuant to *Brady* was never provided to the DA's Office and thus was not provided to Plaintiff's trial counsel. Defendant Floyd County and FCPD officials failed to provide training and supervision to FCPD personnel regarding their disclosure obligations despite their knowledge

of non-compliance with those obligations and the fact that criminal defendants' constitutional rights would be violated due to the deliberate indifference to the obvious need for training and supervision on this subject.

(g) In other respects to be proved through discovery and at trial.

367.   Plaintiff expressly alleges that the need for training and supervision regarding the areas identified above was so obvious, that Defendant Floyd County was on notice of both the lack of training and supervision and the fact that individuals' rights and safety were at near-certain risk of violation due to those widespread and persistent deficiencies. Defendant Floyd County was deliberately indifferent to the obvious need for proper training and supervision and the risks that would accompany the continued absence of proper training and supervision.

368.   Plaintiff further alleges, upon information and belief, that Floyd County and FCPD officials were aware of a widespread and pervasive pattern of incidents involving FCPD investigators generally, and Defendants Battle and Stewart specifically, such as to put Floyd County and FCPD officials on notice that individuals' safety, freedom, and constitutional rights were subject to undue jeopardy as a direct and proximate result of the failure to see that proper training and supervision were implemented.

369.   For the foregoing reasons, Defendant Floyd County is liable for its municipal policy of failing to provide training and supervision with respect to the law enforcement obligations and duties as outlined in this Count. As a direct and

proximate result of those failures on the part of Defendant Floyd County, Plaintiff was subjected to unlawful seizure and arrest, a wrongful conviction, and the loss of 25 years of his life due to wrongful incarceration.

### COUNT IX: 42 U.S.C. § 1983 Claim for First and Fourteenth Amendment Violations – Denial of Meaningful Access to the Courts

(Against All Defendants)

370.    Plaintiff hereby incorporates all the foregoing paragraphs if fully restated herein and further alleges as follows:

371.    Defendants deprived Plaintiff of his constitutional right to due process of law and meaningful access to the courts (a) by initially concealing their misdeeds, including the fabrication of inculpatory evidence, and the existence of material exculpatory evidence from Plaintiff, the prosecutor, and the court, and (b) by continuing to conceal evidence and records with which Plaintiff could have proved his innocence post-conviction and thereby secured his release from prison.

372.    In the manner described above, Defendants wrongfully fabricated evidence which was used to wrongfully secure a conviction against Plaintiff. Defendants further concealed both their wrongful acts and the existence of exculpatory evidence to which Plaintiff was entitled to use in his defense at trial. Such misconduct was violative of Plaintiff's constitutional rights, including his right to meaningful access to the courts.

373.    Following Plaintiff's wrongful conviction, Defendants continued to conceal their misconduct and deprived Plaintiff of evidence that would have allowed him to successfully challenge his conviction through post-conviction remedies that were available to him, including but not limited to an emergency motion for new trial. Such efforts, based on evidence which Defendants concealed and/or destroyed, would have been successful and would have led to Plaintiff's exoneration and release from prison.

374.    Defendants were, at all relevant times, aware of Plaintiff's persistent and truthful denial of any involvement in Brian Bowling's death. Defendants were also aware of efforts on behalf of Plaintiff and others acting on his behalf to uncover evidence necessary to prove Plaintiff's innocence or to otherwise obtain relief in the form of clemency or parole. Defendants willfully and/or recklessly interfered with Plaintiff's constitutional rights by continuing to deny him and those acting on his behalf access to evidence which would exonerate Plaintiff.

375.    Evidence and records which should have been kept and maintained by Floyd County, the Floyd County Police Department, and the Floyd County Coroner's Office were not properly kept and maintained. Regular audits and inventories of the records and evidence facilities were not conducted. As a result, post-conviction requests for records and evidence from the underlying criminal

case went unheeded and efforts to pursue meaningful post-conviction access to courts on Plaintiff's behalf were stymied.

376.    Due to Defendants' misconduct and continued concealment of exculpatory evidence, together with Floyd County's failure to see that proper records were kept, Plaintiff was denied access to evidence, and materials needed to file properly supported post-conviction motions or otherwise obtain meaningful access to the courts.

377.    Throughout the time in which Plaintiff sought to have his wrongful conviction overturned, Defendant Floyd County possessed actual knowledge of the misconduct, breach of oath of office, and gross incompetence on the part of Coroner Craig Burnes. Further, Defendant Floyd County was aware of the critical nature of Burnes's purported opinions regarding Brian Bowling's death and the manipulation of those opinions by FCPD investigators in the prosecution of Plaintiff.

378.    In particular, Defendant Floyd County was aware of Defendant Burnes's convictions on multiple crimes involving deceit, dishonesty, and breach of public trust in August 1999 – some 19 months after Plaintiff's wrongful conviction. Defendant Floyd County and FCPD leadership were aware of both the critical nature of Burnes's testimony at Plaintiff's criminal trial and that Defendant

Burnes had engaged in unlawful conduct in his role as Coroner from at least January 1996 through September 1998.

379.    Throughout the time in which Plaintiff sought to have his wrongful conviction overturned, Defendant Floyd County possessed actual knowledge that FCPD investigators actively solicited statements and testimony from pre-trial detainees housed at the Floyd County Jail, as well as from others with reason to want to curry favor with law enforcement. Floyd County knew or should have known that false testimony would be sought and would result in false convictions. Floyd County likewise knew or should have known of reason to question the propriety of investigations led by Defendants Battle and Stewart.

380.    In particular, Defendant Floyd County was aware of multiple issues involving Defendants Battle and Stewart that bore directly on their honesty, integrity, and fitness for office which should have prompted re-investigation and remedial action with respect to any criminal prosecutions in which Defendants Battle and Stewart served as lead detectives. The incidents involving those Defendants and described at para. 12 of this Complaint should have prompted a review of their cases at the time of occurrence of those incidents, e.g., (Battle's May 2007 termination for having sex with an informant; Battle's July 2016 arrest for battery and violation of oath of office for tasing a defenseless, restrained inmate; Battle's false statements in a search warrant application as reported in a February

2008 published opinion by the Georgia Supreme Court; the 2016 revocation of Battle's law enforcement officer certification; Stewart's January 2007 resignation in lieu of termination by the FCPD for multiple policy violations; Stewart's August 2002 threat to a rape crisis center volunteer which resulted in a complaint regarding his "unprofessional" and "scary" behavior; and Battle and Stewart's October 1999 incident in which they engaged in excessive force against a handcuffed suspect apparently in an effort to obtain an incriminating statement).

381.   Defendant Floyd County had direct knowledge, through the specific incidents of misconduct described herein, as well as others to be explored in discovery, that Defendants Battle and Stewart lacked the professionalism, integrity, competence, and judgment to serve as law enforcement officers. Despite that knowledge, Defendant Floyd County empowered Battle and Stewart to wreak havoc on the lives of Floyd County citizens. Wrongful prosecutions and the violation of constitutional rights resulted. Defendant Floyd County knew this and, despite the frequent and regular reminders of the unfitness of Battle and Stewart, did nothing to address the injustice inflicted upon Plaintiff and others.

382.   At no time did Defendant Floyd County call for or agree to a re-investigation of the criminal case against Plaintiff.[30] Nor did any of the other

---

[30]   Similarly, at no time did Floyd County call for or agree to a re-investigation of the criminal case against Joey Watkins, another individual who was contemporaneously

Defendants ever make known the extent of fabricated evidence used in the prosecution of Plaintiff or the existence of exculpatory evidence.

383.    Moreover, having placed Plaintiff in a position of peril and immediate continuing danger, Defendants were under a legal and constitutional duty to come forward with exculpatory evidence in their possession in each and every year following Plaintiff's conviction in 1998 through Plaintiff's exoneration in 2022.

384.    As a result of Defendants' acts and omissions, Plaintiff was deprived of evidence that would have allowed him to successfully challenge his conviction through post-conviction remedies that were available to him, including but not limited to an Extraordinary Motion for New Trial and an Application for Writ of Habeas Corpus, under then-prevailing Georgia law. Such a motion, based on evidence which Defendants failed to disclose, would have been successful and would have led to Plaintiff's exoneration and release from prison years earlier.

385.    The wrongful acts and omissions that caused Plaintiff's initial and continued wrongful conviction and incarceration were carried out pursuant to the municipal defendant's policies, customs, patterns or practices as described in Counts VI and VII brought pursuant to *Monell*. Those municipal policies, customs or patterns and practices of Floyd County were the moving force behind Plaintiff's

---

wrongfully convicted following improper investigative tactics and the solicitation of witnesses known to be unreliable.

continued wrongful incarceration and proximately, directly and foreseeably caused Plaintiff's continued wrongful incarceration by systematically denying him and his representatives of evidence needed to prove his innocence.

386.   Defendants' actions and omissions, collectively, foreseeably, directly and proximately deprived Plaintiff of his rights under the First and Fourteenth Amendments by unlawfully interfering with his right of meaningful access to the courts and needlessly extended his wrongful incarceration. As a result of Defendants' misconduct, Plaintiff was wrongfully imprisoned for 25 years, and suffered physical, emotional, psychological, and pecuniary injuries as described in this Complaint and to be proved through discovery and at trial.

## STATE-LAW CLAIMS

## <u>COUNT X: Intentional Infliction of Emotional Distress</u>

(Against All Defendants)

387.   Plaintiff hereby incorporates all the foregoing paragraphs as if fully set forth herein and further alleges as follows:

388.   In the manner described more fully above, Defendants caused Plaintiff to be wrongfully arrested, seized, and prosecuted for crimes of which he was completely innocent. Defendants' conduct was extreme and outrageous and exceeds all bounds usually tolerated by a decent society.

389.    The misconduct of Defendants was undertaken intentionally and in deliberate disregard of a high probability that emotional distress would follow.

390.    As a result of Defendants' misconduct, Plaintiff suffered severe and debilitating emotional distress.

391.    Upon information and belief, Defendant Floyd County has procured policies of liability insurance which provide coverage for the acts and omissions that are the subject of the state-law torts, such that sovereign immunity has been waived. Additionally, because Defendants acted deliberately, willfully and wantonly, and in bad faith and with malice, they are not shielded from liability by public officer immunity.

392.    Defendant Floyd County is responsible for the tortious conduct of its agents and employees pursuant to the doctrine of respondeat superior.

393.    Defendants are, jointly and severally liable, to Plaintiff for intentional infliction of emotional distress and all damages and injuries as alleged in this Complaint and to be proved through discovery and at trial.

## COUNT XI: Malicious Prosecution

(Against All Defendants)

394.    Plaintiff hereby incorporates all the foregoing paragraphs as if fully set forth herein and further alleges as follows:

395.    In the manner described more fully above, Defendants subjected Plaintiff to an unlawful prosecution without probable cause. They did so deliberately and with malice.

396.    Defendants caused a criminal proceeding to be instituted against Plaintiff, which actions were undertaken deliberately, willfully and wantonly and with malice. No probable cause supported the criminal charges that were instituted against Plaintiff. The criminal proceedings were ultimately terminated in Plaintiff's favor with the December 2022 Orders granting the EMNT and the Motion for Nolle Prosequi.

397.    Defendants' actions were wrongful and constitute malicious prosecution under Georgia law. Because Defendants acted deliberately, willfully and wantonly, and in bad faith and with malice, they are not shielded from liability by public officer immunity.

398.    Upon information and belief, Defendant Floyd County has procured policies of liability insurance which provide coverage for the acts and omissions that are the subject of the state-law torts, such that sovereign immunity has been waived.

399.    Defendant Floyd County is liable for the tortious acts of its agents and employees pursuant to the doctrine of respondeat superior.

400.    Defendants are, jointly and severally liable, to Plaintiff for state-law malicious prosecution and all damages and injuries as alleged in this Complaint and to be proved through discovery and at trial.

## DAMAGES

1.    As a direct and proximate result of Defendants' violation of Plaintiff's civil and constitutional rights and obstruction of justice, Plaintiff was arrested, deprived of fair criminal proceedings, wrongfully convicted, and imprisoned for more than 25 years for crimes he did not commit.

2.    As a result of Plaintiff's wrongful conviction and imprisonment, Plaintiff sustained physical injuries and sicknesses and other personal injuries, entitling him to recover compensatory damages. Those injuries include but are not limited to:

(a)    humiliation, indignities, and embarrassment;

(b)    damage to reputation;

(c)    damage to family relations;

(d)    inadequate medical and dental care;

(e)    poor nutrition;

(f)    physical pain and suffering;

(g)    severe emotional distress;

(h)    depression;

(i)  loss of employment, wages, and benefits;

(j)  diminished earning capacity;

(k)  restrictions on all forms of personal freedom including but not limited to diet, sleep, human contact, educational opportunity, employment, athletic opportunity, physical activity, personal fulfillment, parental responsibilities, access to media and technology, travel, and the right to express oneself and to live a life of one's own choosing; and

(l)  such other injuries as may be shown by the evidence.

3.  The acts of the individual Defendants alleged above were willful, wanton, intentional, and evinced a reckless disregard for and indifference to the rights and safety of the public, including Plaintiff, who as a result spent more than 25 years in prison for crimes he did not commit.

4.  Defendants are jointly and severally liable to Plaintiff for compensatory damages resulting from the violation of his civil rights, obstruction of justice, and wrongful conduct as described herein.

5.  For the reasons set forth above, the individual Defendants should also be subject to punitive damages in an amount sufficient to punish them for their wrongful actions and to deter others from such misconduct in the future.

6.  Plaintiff is entitled to recover his reasonable attorneys' fees and litigation expenses from Defendants pursuant to 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

Based on the foregoing, Plaintiff respectfully prays for the following relief:

1.     Compensatory damages from all Defendants, jointly and severally, in an amount to be determined at trial.

2.     Punitive damages from the individual Defendants, jointly and severally, in an amount to be determined at trial, that will deter such conduct by Defendants and other officials and law enforcement officers in the future.

3.     Reasonable attorneys' fees and litigation expenses from Defendants under 42 U.S.C. § 1988.

4.     Costs of court and interest as allowed by law.

5.     A trial by jury on all contested issues of fact.

6.     Such other and further relief as the Court may deem just and proper.

This the 1st day of November 2024.

WEINBERG, WHEELER,
HUDGINS, GUNN & DIAL, LLC
**By:** */s/ Henry C. Debardeleben IV*
Henry C. Debardeleben IV
GA Bar No. 111320
3344 Peachtree Road N.E., Suite 2400
Atlanta, GA 30326
Telephone: 404-876-2700
Fax: 404-875-9433
ddebardeleben@wwhgd.com
*Local Counsel for Plaintiff*

**OLSON LAW, PLLC**
By: */s/ G. Christopher Olson*
G. Christopher Olson (NC Bar No. 21223)
514 Daniels Street, #136
Raleigh, NC 27605
Telephone: (919) 624-3718
Facsimile: (919) 328-5355
chris@olsonlaw-pllc.com
*Attorney for Plaintiff Lee Clark*
(Pending *Pro Hac Vice* Admittance)

**PFEIFFER RUDOLF**
By: */s/ David S. Rudolf*
David S. Rudolf (NC Bar No. 8587)
Sonya Pfeiffer (NC Bar No. 37300)
Phillip E. Lewis (NC Bar No. 27944)
2137 South Boulevard, Suite 300
Charlotte, North Carolina 28203
Telephone: (704) 333-9945
Facsimile: (704) 335-0224
dsr@pr-lawfirm.com
spf@pr-lawfirm.com
pel@pr-lawfirm.com
*Attorneys for Plaintiff Lee Clark*
(Pending *Pro Hac Vice* Admittance)